RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0503p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SEFERIN CERAJ and IRINI DEDA-CERAJ,

*Petitioners,*

*v.*

No. 06-4148

MICHAEL B. MUKASEY, Attorney General of the
United States,

*Respondent.*

On Appeal from the Board of Immigration Appeals.
Nos. A70 372 039; A73 629 551.

Submitted: December 7, 2007

Decided and Filed: December 28, 2007

Before: DAUGHTREY, GILMAN, and COOK, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Bruno Joseph Bembi, Hempstead, New York, for Petitioners. Jeffrey L. Menkin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. Seferin Ceraj and his wife, Irini Deda-Ceraj, both natives and citizens of Albania, entered the United States using fraudulent documents in March of 1997. In August of 1997, Ceraj filed an application for asylum, withholding of removal, and protection under the United Nation's Convention Against Torture (CAT). Deda-Ceraj filed an application that was entirely derivative of her husband's. Notices to Appear, charging them with being subject to removal, were issued in February of 2001. Following a merits hearing in March of 2005, an Immigration Judge (IJ) denied the petitioners' request for relief and ordered them removed. The IJ found that Ceraj (1) filed a frivolous asylum application, (2) did not testify credibly, and (3) failed to establish either past persecution or a well-founded fear of future persecution in Albania. The Board of Immigration Appeals (BIA) adopted and affirmed the IJ's decision in a *per curiam* order. Ceraj and his wife timely petitioned for review. For the reasons set forth below, we **DENY** their petition.

1

# I. BACKGROUND

## A.    Factual background

Ceraj initially fled from Albania in November of 1990.  He filed an application for refugee status while in Yugoslavia in 1991.  At that time, Ceraj stated that he had left Albania because

> [m]y aunt fled from Albania 15 years ago.  [H]er son was sentenced to 12 years' imprisonment because of that, and he was confined.  Our family was discredited and mistreated.  Without freedom, democracy, religion, threatened and without right to education and to free choice of employment, I decided to escape from Albania.

The former Immigration and Naturalization Service (the INS, now the Department of Homeland Security) denied Ceraj's application for refugee status in November of 1991, finding that he had not been persecuted.

In April of 1991, while still living in Yugoslavia, Ceraj allegedly reentered Albania to participate in a demonstration against the Albanian government.  Ceraj was arrested by the police during the demonstration and held for three days, during which time he claims that he was beaten.  But he did not disclose this information during the interview regarding his refugee application in May of 1991.  According to Ceraj, he feared that he would be sent back to Albania if the American authorities knew that he had reentered the country once before.

Ceraj returned to Albania in 1994, began farming with his father, and married Deda-Ceraj.  The Democratic Party was in control of the Albanian government at the time.  In early 1997, Ceraj and his wife allegedly participated in at least four demonstrations against the government and its leader, Sali Berisha.  At one of the demonstrations, Ceraj claims that the police broke his arm and injured his back.  In March of 1997, Ceraj and Deda-Ceraj left Albania and used fraudulent documents to gain admission into the United States at New York City.

Ceraj filed an application for asylum in August of 1997.  In that application, Ceraj stated that he was seeking asylum because of his political and religious views.  He claimed that he was "constantly activ[e]" in the demonstrations that took place during the fall of the Communist regime in Albania and cited his involvement in the April 1991 protest.  Ceraj said that he was arrested because he "and most of the young people of Shkodra were trying to take down the statute of the ex-leader Enver Hoxha."  He also stated that he was involved "with the organizations" that were trying to stop government-led pyramid schemes in early 1997 and that he was beaten several times and threatened with arrest or death.  The application further indicates that Ceraj was a "member of a demokratik [sic] party of Albania [since] April [19]90."  According to the handwritten notes prepared by the asylum interviewer, Ceraj's duties and responsibilities as a party member included distributing leaflets.

Ceraj filed a supplemental application for asylum in late October of 2001.  An affidavit accompanied this application and provided more details regarding Ceraj's asylum claim.  According to this latest application, Ceraj feared returning to Albania "because of [his] political beliefs which are anti-Communist and [his] membership in a well-known anti-Communist family in Northern Albania."  Ceraj claims that he is well known to the Communist Party of Albania and many members of the current Socialist government.  He also makes reference to his membership in the Roman Catholic minority population in Northern Albania.

Ceraj's supplemental application lists three instances in which he was allegedly mistreated by the Albanian authorities.  First, Ceraj claims that he left Albania in 1990 because he had been targeted by the Communist secret police for listening to radio programs such as "Voice of America" and "Vatican Voice."  The secret police allegedly broke Ceraj's radio and told him that they would

"take other measures" if he did not stop listening to the radio and encouraging others to do likewise. Ceraj felt that he would be "arrested and executed" if he continued his behavior. He in fact claims that ten days after the incident with the radio, the secret police told him that he would be killed. The supplemental application is the first time that any mention is made about this specific incident. According to Ceraj's testimony during the hearing, he did not mention the radio incident during his initial refugee application in 1991 because the interpreter "in that situation was from Kosovo." Ceraj also claimed that he might not have understood the question.

Contrary to his asylum application in 1997, Ceraj alleges that he was not a member of the Democratic Party before he left Albania because the party had yet to be organized. He acknowledges, however, that he was "active in seeking to bring about the end of the Communist Regime and to form a new anti-communist political structure." Ceraj testified before the IJ that he had "never been a member of any political party" and that he "was for freedom, just that."

The second alleged instance of mistreatment by the Albanian authorities set forth in Ceraj's 2001 supplemental application was his arrest at the demonstration in April of 1991. In the affidavit accompanying Ceraj's application, he provides details about how he swam across the Buna River into Albania the night before the demonstration with his cousin and three other men. During his testimony before the IJ, however, Ceraj repeatedly changed the number of people who swam with him. He initially stated that there were three people, then four, then five who swam across the river. Ceraj also was unclear about whether his brother was among the persons involved in this incident.

After the men arrived in Albania, they hid in a hay wagon and rode to the demonstration. Ceraj claims that the demonstration was peaceful until the police attacked the protestors. He was arrested and held without being charged for three days, during which time Ceraj claims that the prisoners were "beaten and abused." In his supplemental asylum application, Ceraj acknowledges that he failed to disclose his return to Albania during his refugee-application process in 1991, but claims that he did so "because [he] was afraid they would send [him] back to Albania."

The final allegation of mistreatment that Ceraj lists in his supplemental application is the injuries he claims to have suffered in 1997 while protesting against pyramid schemes perpetrated by the Albanian government. Specifically, Ceraj states that he and his wife participated in at least four demonstrations in Shkodre, and that on one of these occasions his arm was broken and he received a back injury. Ceraj contended in his supplemental application that he was directly identified by the police and beaten with sticks. But he never sought formal medical treatment for his broken arm, which casts considerable doubt on the veracity of this alleged injury.

During his testimony before the IJ, Ceraj stated his belief that the police from his area would kill him if he returned to Albania. He alleges that some of the police officers currently working in the area were the officers who had initially confronted him about listening to prohibited radio programs. His mother has also allegedly told him not to return to Albania because the police would kill him.

## B.    Procedural background

Both Ceraj's and Deda-Ceraj's applications were addressed at a merits hearing in March of 2005. The IJ determined that Ceraj had filed a frivolous asylum application and that his testimony was not credible. This caused the IJ to deny Ceraj's request for relief and to order both Ceraj and his wife removed. The BIA adopted and affirmed the IJ's decision in a *per curiam* order with additional commentary. Ceraj and his wife timely appealed the BIA's order. This court denied their motion to stay their removal pending resolution of the present appeal.

## II.  ANALYSIS

**A.        Asylum claim**

Because the BIA adopted the IJ's decision with additional commentary, we review the decision of the IJ, as supplemented by the BIA, as the final administrative order. *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005).  Questions of law involving immigration proceedings are reviewed de novo.  *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004).  But we will affirm the IJ's factual findings, as well as the determination that the petitioner failed to establish eligibility for asylum, if substantial evidence supports such determinations.  *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (holding that a factfinder's rulings will be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole") (citation omitted).  Under this standard, we will not reverse a factual determination of the IJ unless we find "that the evidence not only supports a contrary conclusion, but *compels* it."  *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (emphasis in original).

> ***1.        Substantial evidence supports the IJ's finding that Ceraj's asylum application was frivolous***

An alien who "knowingly made a frivolous application for asylum" despite receiving notice of the consequences, "shall be permanently ineligible for any benefits" of the asylum laws.  8 U.S.C. § 1158(d)(6).  The implementing regulation provides that "an asylum application is frivolous if any of its material elements is deliberately fabricated."  8 C.F.R. § 1208.20.  A finding of frivolousness requires:

> (1) notice to the alien of the consequences of filing a frivolous application, (2) a specific finding by the IJ or the BIA that the alien knowingly filed a frivolous application, (3) sufficient evidence in the record to support the finding that a material element of the asylum application was deliberately fabricated, and (4) an indication that the alien has been afforded sufficient opportunity to account for any discrepancies or implausible aspects of the claim.

*Lazar v. Gonzales*, 500 F.3d 469, 475 (6th Cir. 2007).  Moreover, "[b]ecause of the severe consequences that flow from a frivolousness finding, the preponderance of the evidence must support an [IJ's] finding that the [petitioner] knowingly and deliberately fabricated material elements of the claim."  *Id.* (second and third alterations in original) (quoting *In re YL*, 24 I. & N. Dec. 151, 157 (BIA 2007)).

The IJ found the following incidents in Ceraj's asylum application to be fabrications: (1) the account of persecution for listening to the prohibited radio programs, and (2) the account of swimming back into Albania to participate in a demonstration.  As the IJ explained, although Ceraj now claims that the radio incident was the cause of his initial flight from Albania, he did not mention it in his 1991 refugee application or in his 1997 asylum application, and "[i]t wasn't mentioned until several years later when his current lawyer helped him file the most recent application."  This information is material to Ceraj's claim because Ceraj alleges that "the same people who persecuted him for this listening still are in power today."  The IJ also based his finding of fabrication on the fact that Ceraj admitted that he lied about not returning to Albania in his initial application for refugee status and could not accurately recount how many people swam back to Albania when he allegedly attended the demonstration in 1991.

In adopting the IJ's finding, the BIA held that "there are sufficient inconsistencies, which are in the record, to support a determination that material aspects of the lead respondent's claim, as detailed in his most recent asylum application and in his testimony during the instant proceedings, were deliberately fabricated."  The BIA did not make any specific supplemental findings related to

frivolousness, but noted that Ceraj received adequate warning of the consequences of submitting a frivolous application and "subsequently failed to offer explanations for the discrepancies" that the IJ found in the various applications.

We find ourselves in agreement with the BIA that Ceraj received adequate warning about the consequences of filing a frivolous application for asylum. At the commencement of the hearing in March of 2005, the IJ explicitly told Ceraj that his two applications "really are, when read together, one long continuous application." The IJ further informed Ceraj that he "might have to explain why the two applications may be different," but Ceraj would be given "the opportunity of correcting anything in it that's wrong." Ceraj was then informed of the consequences of filing a frivolous application, and the IJ explained that the application would be deemed frivolous if Ceraj "lied about something that was important to [his] application, and when [he] lied, [he] knew [he] was not be[ing] truthful." The IJ then asked Ceraj if he had been over the application line-by-line and word-for-word using a competent translator, and Ceraj said that he had. Ceraj stated that there was nothing in the application that he wished to change. The record also indicates the Ceraj received a written warning about the consequences of filing a frivolous application at the commencement of the hearing.

Ceraj argues on appeal that the IJ's warning was not sufficient because it came too late and Ceraj was not offered the opportunity to withdraw his application. Specifically, Ceraj contends that because he received no warning when he filed his 1997 application, the warning during the 2005 hearing should be inoperative with respect to that document. The IJ, however, explicitly told Ceraj that his two applications would be treated as one continuous application and that he would have to address any discrepancies between the two documents. Ceraj offers no legal support for his argument that he should have been told he could withdraw his application. The governing regulation simply states that a finding of frivolousness "shall only be made if the immigration judge or the Board is satisfied that the applicant, during the course of the proceedings, has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim." 8 C.F.R. § 1208.20.

After careful review, we conclude that the preponderance of the evidence supports the IJ's determination that Ceraj knowingly and deliberately fabricated a material element of his application. We specifically believe that sufficient evidence supports the IJ's finding that Ceraj fabricated his claim of mistreatment for listening to prohibited radio stations. The radio incident appears for the first time in Ceraj's supplemental asylum application filed in 2001. There is no mention of the incident in either Ceraj's 1991 refugee application or his 1997 asylum application. During his testimony before the IJ, Ceraj attempted to explain these omissions by blaming the translators for failing to include the radio incident when they transcribed his account. Ceraj, however, also indicated that he had read his answers on both applications and approved them before he signed.

The radio incident is material to Ceraj's asylum claim because it presents the only example of direct and targeted personal mistreatment of Ceraj by the Albanian authorities. As the most colorable claim of past persecution, Ceraj's allegation that he was beaten for listening to prohibited radio programs is essential to his asylum claim.

We are less confident about the IJ's additional finding of frivolousness with respect to Ceraj's claim that he swam back into Albania to participate in a demonstration. Although Ceraj made inconsistent statements concerning how many people were with him during that incident, this inconsistency could conceivably have been the product of a failed memory rather than a deliberate and knowing falsification. At the same time, however, he admitted lying on his refugee application, in which he denied ever having returned to Albania after seeking refugee status in Yugoslavia, and then attempted to excuse that falsehood by attributing it to fear that he would be sent back to Albania if his application established that he had returned voluntarily once before.

The IJ noted that Ceraj "lied about staying in Yugoslavia over a period of time," yet the IJ still concluded that Ceraj "never swam back into the country to participate in th[e] demonstration." Although these two conclusions appear to be contradictory, we have no need to agree or disagree with the IJ's additional finding of frivolousness because one material fabrication is enough to support a finding of frivolousness. 8 C.F.R. § 1208.20 ("[A]n asylum application is frivolous if any of its material elements is deliberately fabricated."). Moreover, we agree with the IJ and the BIA that Ceraj was afforded sufficient opportunity to account for the discrepancies in his various applications. Ceraj testified at length during the merits hearing and was examined by his own counsel, counsel for the Department of Homeland Security, and the IJ. At the close of Ceraj's testimony during the March 2005 hearing, the IJ said:

> Sir, I think that you have completely made up out of nothing two things, and they are related. Before I can find your application to be frivolous, or at least think about it, I need to give you the opportunity of explaining any inconsistencies and implausible aspects of your claim.

The IJ then explained why he believed that Ceraj fabricated the radio-listening incident and the swim-across-the-river incident. Finally, the IJ said the following to Ceraj:

> Now is your one and only opportunity, sir, to explain to me why those were not blatant falsehoods. Sir, before you answer, keep in mind that you claim to have a daughter who is a United States citizen. If I find that you lied to me about these two things and my decision is upheld on appeal, it's going to be impossible for you to ever return to the United States or try to adjust your status based upon your daughter. So if you've lied to me, now's your time to fess up.

Ceraj responded by saying that he does have a daughter, and that both of the disputed events were true. Based on the foregoing, Ceraj was given repeated opportunities to clear up any discrepancies regarding the specific incidents that the IJ believed were fabricated.

We thus conclude that there was sufficient evidence to support the IJ's finding that Ceraj's asylum application was frivolous. Deda-Ceraj's application is entirely derivative of Ceraj's, and is therefore also frivolous.

### 2. *Substantial evidence supports the IJ's finding that Ceraj was not credible*

Credibility findings are findings of fact and are therefore reviewed under the substantial-evidence standard. *Yu v. Ashcroft*, 364 F.3d 700, 702-03 (6th Cir. 2004). "Even so, the immigration judge's conclusion must be supported by specific reasons and must be based upon issues that go to the heart of the applicant's claim. In other words, if discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." *Chen v. Gonzales*, 447 F.3d 468, 472 (6th Cir. 2006) (alterations, citations, and quotation marks omitted).

The IJ based his adverse credibility determination on the same inconsistencies that led him to find that Ceraj's application was frivolous—namely, his belated reliance on the radio incident and his inability to accurately recall his first reentry into Albania. Moreover, the IJ referred to Ceraj's inconsistent testimony regarding whether or not he was a member of the Democratic Party. He noted that Ceraj declared his membership in his 1997 asylum application but denied it during the 2005 hearing.

The BIA concluded that the IJ's adverse credibility determination did not constitute clear error. Ceraj admitted in his appeal to the BIA that there were "many discrepancies in the record" and that he "did not explain them very cogently." The BIA agreed with Ceraj's assessment and did

"not find that such discrepancies, which were not previously explained, have been adequately explained on appeal."

Ceraj now argues that the BIA applied the wrong legal standard in reviewing the IJ's adverse credibility determination. According to Ceraj,

> [f]ailure to give appropriate consideration to explanations in the record for perceived contradictions, failure to take into account that asylum applications may not be filled out in the best of circumstances, and failure to conduct the appropriate analysis under the substantial evidence standard are legal errors which are reviewed *de novo*.

But the case that Ceraj relies on, *Shkabari v. Gonzales*, 427 F.3d 324 (6th Cir. 2005), does not support his argument. This court in *Shkabari* reiterated the longstanding precedent that "[w]e review adverse credibility determinations under the substantial evidence test." *Id.* at 329.

The specific reasons offered by the IJ for his adverse credibility determination, including the omission of the radio incident, the inconsistent testimony regarding the swimming incident, and Ceraj's contradictory testimony about his membership in the Democratic Party, go to the heart of Ceraj's claim for asylum. We also note that although Ceraj's inconsistent testimony regarding his swim to Albania does not necessarily establish deliberate fabrication by a preponderance of the evidence, it does bear on the issue of Ceraj's credibility. In sum, we do not believe that "any reasonable adjudicator would be compelled" to reverse the IJ's adverse credibility determination. 8 U.S.C. § 1252(b)(4)(B).

### 3.      *Even if the IJ erred in his frivolity and credibility determinations, substantial evidence supports the IJ's conclusion that Ceraj was not entitled to asylum*

Adjudicating a request for asylum involves a two-step inquiry: "(1) whether the applicant qualifies as a refugee as defined in [8 U.S.C.] § 1101(a)(42)(A), and (2) whether the applicant merits a favorable exercise of discretion by the Attorney General." *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998) (citation and quotation marks omitted). With respect to the first issue, the term "refugee" is defined by federal law as

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).

"The asylum applicant bears the burden of establishing that he or she qualifies as a refugee 'either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution.'" *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003) (quoting 8 C.F.R. § 208.13(b)). Once the applicant shows that he or she has suffered from past persecution, the applicant is "presumed to have a well-founded fear of future persecution." *Mikhailevitch*, 146 F.3d at 389 (quoting 8 C.F.R. § 208.13(b)(1)(i)). This presumption can be rebutted "only through establishing by a preponderance of the evidence that since the persecution occurred, conditions in the applicant's country 'have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he were to return.'" *Id.* (citation omitted).

According to Ceraj, he suffered past persecution on three occasions: (1) when the authorities found out that he listened to "Voice of America" and the "Vatican Voice," they broke his radio, threatened him, and slapped him, (2) during a demonstration in April of 1991, he was arrested along with 200 other protestors, detained for three days, and beaten, and (3) in 1997 he participated in a number of demonstrations against the authorities, and at one demonstration the police broke his arm. Ceraj argues that the IJ erred by failing to consider the cumulative impact of the mistreatment that Mr. Ceraj and his immediate family members suffered. Even assuming that all of the evidence Ceraj presented is true and credible, however, he cannot meet the burden of demonstrating that he was subjected to past persecution.

Ceraj admitted in his testimony that he was specifically targeted by the authorities for mistreatment on only one occasion, when he listened to prohibited radio programs. His alleged mistreatment as part of a mass roundup of demonstrators in 1991 and 1997 does not amount to past persecution. *See Pilica v. Ashcroft*, 388 F.3d 941, 954 (6th Cir. 2004) (holding that an Albanian citizen who was jailed after participating in two demonstrations and suffered head injuries following a third demonstration did not demonstrate that he had been persecuted). In *Pilica*, the court noted that "all of the occurrences that arguably constitute past persecution resulted directly from Pilica's attendance at a demonstration rather than from the government having sought him out." *Id.* at 955.

Ceraj was detained during the 1991 protest because he was demonstrating with approximately 200 other individuals. The police appear to have rounded up all of the participants in what they considered an illegal demonstration. They did not single out Ceraj in particular. Moreover, the demonstrations that Ceraj participated in against the government in 1997 occurred at a time when Albania was in a state of emergency and all protests were banned. Ceraj claimed in his supplemental asylum application that he was specifically identified and had his arm broken during one of the 1997 protests. In his testimony during the 2005 hearing, however, Ceraj admitted that the police had not singled him out during the protest and that they accidentally broke his arm.

The above evidence does not compel the conclusion that Ceraj was subjected to past persecution based on his mistreatment during the 1991 and 1997 protests. As this court has previously concluded,

> [i]t is not sufficient that the applicant has been subjected to indiscriminate abuse, such as physical force or violence employed against a crowd of demonstrators, or has been the victim of a random crime. Instead, the applicant must establish that he or she was specifically targeted by the government for abuse based on one of the statutorily protected grounds.

*Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005).

With respect to the radio incident, substantial evidence supports the IJ's finding that even if this event occurred, it does not constitute past persecution. We have held that persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch*, 146 F.3d at 390. Thus, even if Ceraj was threatened and slapped by the police and had his radio broken, we cannot conclude that this alleged mistreatment was sufficiently grave to constitute persecution. We have previously explained that "[p]ersecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Lumaj v. Gonzales*, 462 F.3d 574, 577 (6th Cir. 2006) (holding that an asylum applicant had not suffered past persecution where she "claim[ed] to have been beaten and to have suffered some bodily injuries, but she was not detained, imprisoned, tortured, or sexually assaulted in any way").

The IJ further concluded that, even if Ceraj did suffer from past persecution, "country conditions have changed remarkably and fundamentally" in Albania such that Ceraj could not have a reasonable fear of future persecution. This court has likewise repeatedly concluded that the conditions in Albania have improved to such an extent that there is no objective basis for a well-founded fear of future persecution based on political or religious beliefs. *See, e.g.*, *Ramaj v. Gonzales*, 466 F.3d 520, 530-31 (6th Cir. 2006); *Macotaj v. Gonzales*, 424 F.3d 464, 465 (6th Cir. 2005); *Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2005). Although Ceraj may be subjectively afraid to return, his testimony that the police officers who allegedly punished him for listening to prohibited radio stations in 1990 are still in power and will kill him if he returns does not provide an objective basis for a well-founded fear of future persecution in light of the changed conditions in Albania. We thus conclude that Ceraj and Deda-Ceraj are ineligible for asylum under 8 U.S.C. § 1101(a)(42)(A).

## B.        Withholding of removal and relief under the CAT

Ceraj's application for asylum also requests relief in the form of the withholding of removal and protection under the CAT. An applicant seeking the withholding of removal "must show a 'clear probability of persecution,' which is a stricter standard than the 'well-founded fear' standard that applies with respect to applications for asylum." *Ali v. Ashcroft*, 366 F.3d 407, 411 (6th Cir. 2004) (quoting *INS v. Stevic*, 467 U.S. 407, 430 (1984)). Because substantial evidence supports the IJ's conclusion that Ceraj is not eligible for asylum, he "cannot satisfy the more stringent standard for withholding of deportation." *Daneshvar v. Ashcroft*, 355 F.3d 615, 625 (6th Cir. 2004).

To obtain relief under the CAT, Ceraj must show that he would more likely than not be subjected to torture after being deported to Albania. *See* 8 C.F.R. § 1208.16(c)(2) (placing on the applicant seeking relief under the CAT the burden of proving "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal"); *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004) (reciting the same standard). The "more likely than not" burden of proof is similarly higher than the "well-founded fear" burden required to establish a claim for asylum, so that substantial evidence also supports the rejection by the IJ of Ceraj's CAT claim. *See Elezaj v. Gonzales*, 163 F. App'x 358, 361 (6th Cir. 2005) (holding that if an applicant fails to meet the standard for asylum, he "*a fortiori*" fails to meet the requirements for withholding of removal and relief under the CAT).

## III.  CONCLUSION

For all of the reasons set forth above, we **DENY** the petition for review filed by Ceraj and his wife.