NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0322n.06
Filed: June 6, 2008

**No. 06-3629**


**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

GJOVALIN MELAJ; TATIANA MELAJ,

     **Petitioners,**

v.

MICHAEL B. MUKASEY, ATTORNEY
GENERAL,

     **Respondent.**

     ON PETITION FOR REVIEW FROM THE BOARD OF IMMIGRATION APPEALS.

_____/


**BEFORE:**     SUHRHEINRICH, CLAY and COOK, Circuit Judges.

     **CLAY, Circuit Judge.** Petitioner Gjovalin Melaj, a citizen of Albania, appeals the Board of Immigration Appeals' ("BIA") determination that he was not entitled to asylum pursuant to 8 U.S.C. § 1158, or withholding of removal pursuant to 8 U.S.C. § 1231(b)(3). Because substantial evidence supports the BIA's determination that Petitioner was not entitled to relief, we **AFFIRM** the decision of the BIA denying Petitioner relief.

1

**BACKGROUND**

A.      **Statement of Facts**

Petitioner Gjovalin Melaj was an Albanian policeman from 1990 until 1996. On December 5, 1996, Petitioner was ordered to provide security for government buildings and property during a sizable political protest in Shkodra, Albania. During the second day of the protest, some of the demonstrators became "very aggressive" and began throwing stones at Petitioner and his fellow police officers. As a result, Petitioner was ordered to fire upon the crowd. (J.A. 268) Petitioner, however, felt it would be wrong to shoot people for engaging in a political protest, and he refused to follow this order. Instead, Petitioner turned in his weapons to his supervisor, and informed the supervisor that he was leaving because "I was not going to shoot against the people for any political reason." (*Id.*)

On the morning of December 24, 1996, Petitioner's home was surrounded by "more than 50 or 60 police" who forcibly entered the home and took Petitioner into custody. (J.A. 269–70) For the next 48 hours, Petitioner was detained at the police station, where he was tied up by police officers wearing masks, kicked and beaten with fists and a rubber stick. As a result of these two days of torture, Petitioner suffered headaches, trouble breathing, a full-body bruise and a shoulder injury that prevented him from moving his hand or his arm. Petitioner was released and told to report for a court hearing on January 3, 1997. Because he feared that police would again seize him if he returned home, however, Petitioner fled to his aunt's home in the village of Kastrat.

While Petitioner was in hiding, his brother enlisted the aid of the city of Shkodra's "Kryeplaku," a kind of ombudsman who represents the people of a region in their grievances against the government. Through the Kryeplaku, Petitioner and his family learned that police were searching

2

for him, and Petitioner and his family soon decided that he needed to leave the country for his own safety. Petitioner's parents sold their home and their land to raise money for Petitioner's exodus. Petitioner's brother used this money to acquire an airplane ticket to New York and a passport for Petitioner.

On the night of January 11, 1997, Petitioner left his pregnant wife Tatiana and his sixteen month-old daughter behind, and traveled under cover of darkness to the city of Tiranë, where he was placed on a plane to Germany. After a three-hour layover in Germany, Petitioner boarded another plane to New York. Back in Albania, Petitioner's brother eventually arranged for Tatiana to join Petitioner in the United States, and the couple's second child is an American citizen born in the United States.

At the time of Petitioner's detention, torture and eventual exodus from Albania, the country was governed by Albania's Democratic Party. Shortly after Petitioner's departure, however, financial strains on the Albanian people led to a near-total collapse of the Democratic government. According to the State Department, "[t]he collapse in mid-January [1997] of various "pyramid" schemes that cost the life savings of many Albanians led to fighting and disorder, bringing the country to the edge of anarchy." (J.A. 337) On June 29, 1997, the nation held an emergency election in an effort to rebuild a government with a mandate to rule, and the Democratic government was replaced by one led by Albania's Socialist Party.

According to the Immigration Judge's ("IJ") findings below, Albania made "slow and steady progress towards democratization and stabilization," under the Socialist government. (J.A. 20) The IJ found that there were no reports of politically motivated killings or disappearances under the Socialists, and specifically that there is no evidence to suggest that the Socialist government would

3

persecute a former police officer for refusing an order to fire upon demonstrators protesting the previous Democratic government.[1]

On July 3, 2005, another election returned the Democratic Party to power in Albania.

**B.      Procedural History**

On April 9, 1998, Petitioner filed an application for asylum and withholding of removal, including his wife Tatiana as a dependant. The government responded by initiating deportation proceedings against Petitioner, and in a June 26, 1998 hearing Petitioner conceded removability but again raised his claim for asylum and withholding.

In a November 2, 1998 order, the IJ denied Petitioner's claims. In so holding, the IJ concluded that when Petitioner's supervisor ordered him to open fire on a crowd of civilians, this order was "not something for a police officer in [Petitioner's] shoes to question unless the act was patently illegal or obviously illegal." (J.A. 53) Moreover, the IJ held that when Petitioner was detained and tortured for refusing this order, such punishment "was not done for any imputed political reasons, and it certainly wasn't disproportionate given the nature of his acts." Based on his determination that the nation of Albania was justified in torturing officers who refuse to fire on largely defenseless civilians, and his determination that Petitioner's decision to refuse this order had no political content, the IJ denied Petitioner's claims for asylum and withholding of removal.

Petitioner appealed the IJ's determination to the BIA, and in a June 24, 2003 order, the BIA reversed. Assuming, without deciding, that Petitioner's description of his actions was credible, the

---

[1]Despite the IJ's finding that human rights have advanced under Albania's Socialist Party, the Socialist government was hardly the model of a fair and democratic regime. *See Gilaj v. Gonzales*, 408 F.3d 275, 281 (6th Cir. 2005) (describing persecution inflicted by the Albanian government under Socialist Party rule).

BIA held that a police officer's refusal to fire upon civilian political demonstrators was itself a political act. Accordingly, "any disproportionate punishment he consequently might have received should be considered to be persecution on account of enumerated ground." (J.A. 65) Nevertheless, the BIA remanded this case to the IJ to determine whether or not Petitioner credibly testified as to his actions during the political protest and his subsequent detention and torture.

On remand, the IJ determined that Petitioner's testimony was credible, finding that "what he claimed happened to him, happened to him in Albania." (J.A. 17) Nevertheless, the IJ remained unconvinced that Petitioner was entitled to asylum or withholding of removal. Though acknowledging that he could not directly contradict the BIA's remand order, the IJ expressed incredulity towards that order, complaining that he "is unable to see how a laying down of a weapon and abandoning a post by a police officer is a political act." (J.A. 18) Restricted as he was, however, by the BIA's determination, the IJ turned his attention to the legal significance of Petitioner's detention and torture. Without any legal analysis, the IJ concluded that this detention and torture "by no stretch of the imagination rises to the level of past persecution," and therefore, Petitioner was not entitled to a presumption that he would be subject to future persecution. (*Id.*) Additionally, the IJ determined that the human rights advances brought about under Albania's new Socialist government obviated any fears Petitioner might have of future persecution, and that Petitioner had failed to present credible evidence that he would face such persecution if he was returned to Albania. Accordingly, the IJ once again denied the petition for asylum and withholding of removal.

In a brief, *per curiam* opinion, the BIA affirmed and adopted the IJ's second decision on April 11, 2006. In so holding, the BIA took judicial notice of the fact that during the pendency of Petitioner's second appeal to the BIA, an election in Albania had returned the Democratic Party to

5

power in a "decisive victory." (J.A. 8) The BIA engaged in no discussion, however, of what impact this election may have on Petitioner's case and on the rule of law in Albania.

Petitioner now appeals his case to this Court, arguing that the BIA erred in not affording him a presumption that he would be subject to future persecution, and that the IJ's finding that changed country conditions in Albania obviated Petitioner's fears of future persecution was not supported by substantial evidence.

## DISCUSSION

### *Standard of Review*

Because the BIA adopted the IJ's decision with additional commentary, this Court reviews the decision of the IJ, as supplemented by the BIA, as the final administrative order. *Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007). In performing such review, issues of pure law are reviewed *de novo*. *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006). The IJ's factual findings, however, must be affirmed if substantial evidence supports those determinations. *Ceraj*, 511 F.3d at 588. Under this standard, "we will not reverse those findings 'unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Singh v. Gonzales*, 451 F.3d 400, 403 (6th Cir. 2006) (quoting 8 U.S.C. § 1252(b)(4)(B)).

### *Analysis*

### I.      PETITIONER AS A VICTIM OF PAST PERSECUTION

### A.      Asylum and Withholding of Removal Generally

The Attorney General has discretion to grant asylum to a "refugee," *Perkovic v. I.N.S.*, 33 F.3d 615, 620 (6th Cir. 1994), which is defined as an alien who "is unable or unwilling to return to"

6

their home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The alien bears the burden of establishing that they are a refugee "either because he has suffered actual past persecution or because he has a well-founded fear of future persecution." *Koliada v. I.N.S.*, 259 F.3d 482, 487 (6th Cir. 2001) (quoting 8 C.F.R. § 208.13(a)-(b) (2001)). An alien who establishes that he suffered from past persecution on a protected ground is "presumed to have a well-founded fear of persecution." *Id.* To rebut this presumption, the government must demonstrate either that changed conditions in the alien's home nation obviate the threat of future persecution, or that it would be reasonable to expect the alien to relocate to another part of his home nation where the threat of future persecution does not exist. 8 C.F.R. § 1208.13(b)(1)(i).

An alien qualifies for withholding of removal, and therefore cannot be removed to their home county, if "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). To qualify for such relief, however, the alien must demonstrate that it is "more likely than not" that he would be subject to persecution. *I.N.S. v. Stevic*, 467 U.S. 407, 424 (1984). Nevertheless, an alien who can demonstrate that he suffered past persecution on a protected ground enjoys the same presumption in the withholding of removal context as he does in the asylum context. *See* 8 C.F.R. § 1208.16(b)(1)(i).

The IJ determined that, although Petitioner was detained, tortured, and hunted within his own country, such treatment did not constitute past persecution. Accordingly, Petitioner was not afforded a presumption of eligibility for asylum and withholding of removal. For the reasons that follow, this decision was incorrect as a matter of law.

7

**B.** **The Meaning of "Persecution"**

To benefit from the presumption that he has a well-founded fear of future persecution, Petitioner must establish both that he suffered past persecution and that this persecution was on account of race, religion, nationality, membership in a particular social group, or political opinion. *Koliada*, 259 F.3d at 487. The BIA determined, and the government does not contest, that Petitioner's decision not to fire on political demonstrators was itself a statement of political opinion. Accordingly, the question of whether Petitioner is entitled to a presumption of eligibility for asylum and withholding of removal hinges upon whether his detention, torture and subsequent flight from the Albanian police falls within the definition of past "persecution."

The Immigration and Nationalization Act ("INA") provides no definition of "persecution," and thus far this Court has declined to articulate one. *See Mikhailevitch v. I.N.S.*, 146 F.3d 384, 389 (6th Cir. 1998). Rather than laying out a bright-line rule or even a multi-factor test establishing the scope of the word "persecution," this Court has preferred to engage in case-by-case discussions of the circumstances of individual parties, occasionally providing hints as to what "persecution" may encompass. Thus, precedent teaches that persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty," *id.* at 390, but also that "[a] single incident may be sufficient to constitute persecution." *Mohammed v. Keisler*, 507 F.3d 369, 371 (6th Cir. 2007). It teaches that persecution "embodies punishment or the infliction of suffering or harm," *Mikhailevitch*, 146 F.3d at 389; however, it "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Lumaj v. Gonzales*, 462 F.3d 574, 577 (6th Cir. 2006).

This lack of clarity in regard to the meaning of the word "persecution" may be by Congressional design. In 1978, Congress enacted the Holtzman Amendment to the INA, which prohibits asylum from being extended to persons who themselves engaged in persecution. *See* 8 U.S.C. § 1101(a)(42)(B). In enacting this Amendment, Congress considered providing a specific definition of the word "persecution," but ultimately decided instead to "require [an] individual determination based on the facts in each case." H.R.Rep. No. 95-1452, at 7 (1978), *reprinted in* 1978 U.S.C.C.A.N. 4700, 4706. Nevertheless, the Holtzman Amendment's legislative history does provide a helpful window into Congress' understanding of what constitutes persecution.

The Amendment's legislative history embraces previous case law that described persecution "as the infliction of suffering or harm, under government sanction, upon persons who differ in a way regarded as offensive (e.g. race, religion, political opinion, etc.), in a manner condemned by civilized governments." *Id.* at 5. It would be inconsistent with Congress' intent to treat this description of persecution as providing a rigid, bright-line rule that necessarily excludes oppression which does not fall within its scope. *See id.* at 7 ("It is the intention of the committee that determinations be made on a case-by-case basis in accordance with the case law . . . as well as international material on the subject such as the opinions of the Nuremberg Tribunals.") Nevertheless, when a member of a protected class suffers officially sanctioned harm which is of the severity widely condemned by the international community, such harm falls within the INA's definition of the word "persecution." *See id.* at 5.

In the instant case, Petitioner testified that he was detained and tortured because of his politically motivated decision not to fire on civilians, and the IJ found that Petitioner's testimony accurately described what happened to him. Similarly, Petitioner experienced the harm at the hands

9

of Albanian police officers, thus lending official sanction to his suffering. Accordingly, inasmuch as the ill-treatment which Petitioner experienced was of the severity that is condemned by civilized governments, that treatment amounted to persecution.

**C.      Officially Sanctioned Torture as Persecution**

Torture is an activity which is almost universally condemned by civilized governments. Under the Convention Against Torture no signatory nation may engage in the practice of torture, and indeed such nations must take affirmative action to prevent torture from occurring within their jurisdiction. Dec. 10, 1984, art. 2, 1465 U.N.T.S. 85, 23 I.L.M. 1027, 1028. This prohibition is absolute. "No exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture." *Id.* Under the Convention, torture is defined as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

*Id.*, art. 1.

The Convention Against Torture has over 140 signatory nations including the United States, and though a handful of nations, such as Iran, Iraq and North Korea, have declined to join this prohibition on torture, it is safe to say that the overwhelming majority of "civilized governments" join the Convention's condemnation of officially sanctioned torture. *See* Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *available at* http://untreaty.un.org/ENGLISH/bible/englishinternetbible/partI/chapterIV/treaty14.asp. Moreover,

applying the Convention's definition of torture to the instant facts demonstrates that the harm inflicted on Petitioner is exactly the sort of "severe pain or suffering" which the Convention and its signatory nations condemn.

Petitioner was detained, tied up and beaten repeatedly by police officers wearing masks, suffering injuries that left him unable to move one arm. Moreover, the BIA found that this officially sanctioned harm was inflicted as punishment for Petitioner's refusal to fire upon defenseless political protestors, and appears to have occurred for the purpose of intimidating other police officers against following Petitioner's example. Such maltreatment at the hands of government officials is at least as severe as maltreatment that we have previously stated may amount to torture. *See Ali v. Reno*, 237 F.3d 591, 593, 598 (6th Cir. 2001) (a person who was kicked, beaten and threatened with a gun experienced sufficiently severe treatment to constitute "torture," even though no lasting injuries were inflicted). Accordingly, we hold that Petitioner was a victim of torture, an activity which is condemned by civilized governments. Convention Against Torture, art. 1. Moreover, as we defer to the BIA's findings that Petitioner was tortured by government officials as punishment for his politically motivated actions, we hold that Petitioner experienced "the infliction of suffering or harm, under government sanction, upon persons who differ in a way regarded as offensive (e.g. race, religion, political opinion, etc.), in a manner condemned by civilized governments." H.R.Rep. No. 95-1452, at 7.

## D.    Conclusion

Because Petitioner experienced torture, a practice condemned by civilized governments, and because we differ to the BIA's finding that he was tortured by government officials in retaliation for his political activity, we hold that he suffered past persecution for the purposes of his petition for

11

asylum and withholding of removal, and thus is entitled to a presumption that he has a well-founded fear of future persecution. *See* 8 C.F.R. §§ 1208.13(b)(1)(i) & 1208.16(b)(1)(i).

## II. CHANGED COUNTRY CONDITIONS

Because Petitioner is entitled to a presumption that he had a well-founded fear of future persecution, the burden rests on the government to demonstrate that changed country conditions in Albania obviate Petitioner's fear of persecution. *See* 8 C.F.R. § 1208.13(b)(1)(i). At the time of Petitioner's hearing before the IJ, the Socialist Party remained in power in Albania, and the IJ determined that, even if Petitioner had previously been subject to persecution, the Socialist government was not engaged in the kind of politically motivated torture which Petitioner previously suffered. Substantial evidence does support this finding, and indeed this Court has repeatedly acknowledged the improved country conditions which occurred under Socialist leadership in Albania. *See Lumaj v. Gonzales*, 462 F.3d 574, 578 (6th Cir. 2006); *Liti v. Gonzales*, 411 F.3d 631, 640 (6th Cir. 2005).

The BIA took judicial notice of the fact that the Democratic Party had returned to power in Albania prior to its decision, but apparently did not feel that this fact warranted reversal of the IJ's decision. Inasmuch as this disposition can be read as finding that it is unlikely that the newly empowered Democratic Party would return to its prior abhorrent practices, such a finding is supported by substantial evidence in the record. According to the State Department's March 2004 report on country conditions in Albania, "the available evidence suggests that neither the Government nor the major political parties engage in polices of abuse or coercion against their political opponents." (J.A. 189)

12

Petitioner claims, however, that he was deprived of his due process rights when the BIA did not grant him a full hearing to consider the impact of the July 3, 2005 election on his likely fate if returned to Albania. Because Petitioner failed to raise this due process claim before the BIA, however, this court must dismiss it for want of jurisdiction. *See Ramani v. Ashcroft*, 378 F.3d 554, 561 (6th Cir. 2004) ("[O]nly claims properly presented to the BIA and considered on their merits can be reviewed by this court in an immigration appeal.") The proper remedy for an alien who believes that newly discovered material evidence requires reconsideration of an administrative determination of his immigration status is not an appeal to this Court; rather, it is a motion to reopen filed with the Board of Immigration Appeals. *See* 8 C.F.R. § 1003.2(c)(1); *see also Visha v. I.N.S.*, 51 F. App'x 547, 550 (6th Cir. 2002) (holding that this Court may not take judicial notice of facts not in the administrative record). Until Petitioner exhausts this administrative remedy, he may not raise his due process claim in this Court. *See Ramani*, 378 F.3d at 559.

## CONCLUSION

Substantial evidence supports a finding that changed country conditions in Albania obviate Petitioner's fear of future persecution. Accordingly, the decision of the BIA denying asylum and withholding of removal to Petitioner is **AFFIRMED**.