**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0414n.06
Filed: July 10, 2008

**No. 06-4631**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| FENG JIANG, | ) |
| | ) |
|     Petitioner-Appellant, | )   ON PETITION FOR REVIEW |
| | )   OF AN ORDER OF THE |
| v. | )   BOARD OF IMMIGRATION |
| | )   APPEALS |
| MICHAEL MUKASEY | ) |
| | ) |
|     Respondent-Appellee. | ) |

Before:      BOGGS; Chief Judge; and RYAN and COLE, Circuit Judges.

PER CURIAM.  Feng Jiang sought asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") based on the threat of sterilization if he returned to China. An immigration judge ("IJ") found him ineligible for asylum because his application was untimely, and denied his request for withholding of removal and protection under the CAT because she found him not credible.  The BIA affirmed, and Jiang appealed. We affirm in part and dismiss in part.

I

Jiang was born in 1972 in Fuzhou City, China. On November 5, 1997, he tried to register his marriage to Dong Li Jiang.  Local officials refused to let him do so, and he and his wife then married in a village ceremony.  Jiang testified that their first child, a daughter, was born at his wife's sister's home with the help of a midwife because the hospital refused to admit his wife due to the fact that the couple was not lawfully married.

Jiang claimed that when the authorities learned of the child's birth, they fined him and soon afterwards forced his wife to have an IUD inserted into her body. However, the device was later removed, and Jiang's wife became pregnant again. He testified that his second daughter was born on February 2, 2000, but the family was forced to give her up for adoption. The authorities ordered Jiang to report for sterilization, but he did not show up. He arrived in the United States, without travel documents, on February 16, 2001.[1]

On March 15, 2001, an immigration officer interviewed Jiang and then forwarded the case to an IJ. Six weeks later, on April 23, 2001, the INS sent Jiang a Notice to Appear, informing him that he was ineligible for admission into the United States based on his lack of travel documents and that he was subject to removal under 8 U.S.C. § 1182(a)(7)(A)(i)(1) for the same reason. On March 14, 2002, Jiang, through his attorney Alexander K. Yu, acknowledged his removability and moved for a change of venue from Detroit to New York City. The change of venue was denied. At a Master Calender Hearing on November 15, 2002, Jiang, represented by new counsel, informed the court, for the first time, that he was seeking asylum, withholding of removal, and protection under the CAT. Another hearing took place on March 21, 2003.

IJ Marsha K. Nettles held a Merits Hearing on April 26, 2005. She then issued an oral decision, ruling that Jiang demonstrated a "complete lack of veracity or credibility" and denying all of his claims. The following exchange buttresses her strong language:

---

[1] The record includes a brief interview between Jiang and an INS officer the day Jiang arrived in the United States. Jiang claimed that he had paid a smuggler $50,000 to help him leave China. He stated that his wife's parents own a restaurant in New York City where he intended to work. Notably, Jiang has not submitted any statements by his purported parents-in-law.

> Judge: Can you clarify what this is?
>
> Jiang: It's a birth certificate [for Jiang's daughter].
>
> . . .
>
> Judge: Do you know how your—where your family got this document?
>
> Jiang: In China, all you need is money and your connection.
>
> Judge: Sir, are you saying that this is not a true document, they bought—your family bought this document or purchased it?
>
> Jiang: You can say that because my attorney told me that I needed this
> material.
> . . .
>
> Judge: So that's a fake document?
>
> Jiang: Yes, you can say that.

After the IJ's decision, Jiang filed a one-page, pro se appeal to the BIA on April 28, 2005. On November 22, 2006, the BIA summarily affirmed the IJ. Jiang obtained new counsel and appealed to this court.

## II

An alien may apply to the Attorney General for asylum if the alien can demonstrate a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion" if returned to his country of origin. *Selami v. Gonzales*, 423 F.3d 621, 625 (6th Cir. 2005) (citing 8 U.S.C. §§ 1158(b)(1), 1101(a)(42)(A)). A person who has undergone, or has been threatened with, an abortion or involuntary sterilization is statutorily "deemed to have been persecuted on account of political opinion." 8 U.S.C. § 1101(a)(42)(B). However, if

the alien fails to demonstrate by clear and convincing evidence that he filed for asylum within one year of his arrival in the United States, or that extraordinary circumstances excused his tardy filing, the asylum application will not be considered. *See* U.S.C. § 1158(a)(2)(B). Here, both the IJ and the BIA determined that Jiang did not file his application within the allotted time period.

Courts generally lack jurisdiction to review a determination that an alien's application was untimely. *Almuhtaseb v. Gonzales*, 453 F.3d 743, 746–47 (6th Cir. 2006). The government cites this principle, and even Jiang concedes that "presumably the jurisdiction-stripping provision would cover the Board's decision in this case." However, under the REAL ID Act of 2005, we may review the BIA's ruling that an alien's application was untimely to the extent that it raises a "constitutional claim[] or matter[] of statutory construction." *Almuhtaseb*, 453 F.3d at 748.

Jiang attempts to squeeze into this exception by claiming that the IJ violated his due process rights by not accepting evidence that Jiang filed a timely application for asylum in New York. His argument fails for two reasons: it is waived, and it is without factual support.

First, the issue is waived because Jiang did not present it in his brief to the BIA, and "only claims properly presented to the BIA and considered on their merits can be reviewed by this court in an immigration appeal." *Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006) (quoting *Ramani v. Ashcroft*, 378 F.3d 554, 559 (6th Cir. 2004)). Second, Jiang bases his due process argument on the fact that the IJ who presided over Jiang's November 15, 2002, Master Calender Hearing refused to accept papers that Jiang alleged were evidence that he filed a timely application for asylum. Jiang claims that this refusal violated due process, and that the IJ also violated due process when he "deprived" the record of "this critical piece of evidence" by returning the documents to Jiang's

- 4 -

counsel. Jiang's argument distorts the record. The transcript shows that when Jiang's counsel admitted that he did not know how Jiang obtained the documents that he claimed were copies of an asylum application that Jiang said that he had made earlier, and further admitted that Jiang "couldn't explain" how he got them, the IJ *then* returned the documents and told Jiang's counsel that he would accept them if counsel provided some authentication such as "an affidavit from previous counsel or something." Despite being given this opportunity, Jiang produced nothing that would verify his purported timely application. No copies of these documents appear in the Record. Jiang cannot blame the IJ for "depriving" the record of these documents when the documents were returned to Jiang's own counsel. Jiang should be able to retrieve them or explain their absence. He has not. Therefore, because Jiang has not raised a valid constitutional claim or matter of statutory construction, we lack jurisdiction to review the BIA's determination that Jiang's application for asylum was untimely. *Fang Huang v. Mukasey*, 523 F.3d 640, 650 (6th Cir. 2008); *Almuhtaseb*, 453 F.3d at 748. This portion of Jiang's appeal is dismissed for lack of jurisdiction. *Fang Huang*, 523 F.3d at 650.

III

By contrast, we do have jurisdiction to review the BIA's denial of Jiang's request for withholding of removal and protection under the CAT. When the BIA summarily affirms an IJ's decision, we review the IJ's decision directly while taking into account any additional comments by the BIA. *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005). When an IJ denies relief based on a lack of credibility, as happened here, we review the IJ's findings under the "substantial evidence" standard, meaning that reversal is appropriate only when "the evidence not only *supports* that conclusion, but *compels* it . . . ." *INS v. Elias-Zacharias*, 502 U.S. 478, 481 n.1 (1992).

In order to show that he is entitled to withholding of removal, Jiang must show that there is a "clear probability" that he will be subject to persecution in the proposed country of removal on account of his "race, religion, nationality, membership in a particular social group, or political opinion." *Vasha v. Gonzales*, 410 F.3d 863, 875 (6th Cir. 2005)(quoting 8 C.F.R. § 1208.16(b)).

To obtain relief under the CAT, Jiang must show that it is more likely than not that he will be tortured if he is deported to the proposed country of removal. *Ceraj v. Mukasey*, 511 F.3d 583, 594 (6th Cir. 2007). Torture is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Singh v. Ashcroft*, 398 F.3d 396, 404–05 (6th Cir. 2005) (quoting 8 C.F.R. § 208.18(a)(1)).

A supportable finding that the alien is not credible justifies denying relief. *Ceraj*, 511 F.3d at 591. If the alien's story is internally inconsistent, the IJ may find the alien not credible.[2] *Ibid.* But despite our deferential review of these credibility determinations, "the immigration judge's conclusion must be supported by specific reasons and must be based upon issues that go to the heart of the applicant's claim." *Ibid.* Put differently, the inconsistencies must be relevant to the basis of the alien's application for relief and must be supported by evidence, not speculation.[3] *Vasha*, 410 F.3d

___

[2] For a useful discussion of how the internal consistency and details of an applicant's story can be helpful in distinguishing "honest, persecuted aliens from those who are feigning" when there is no other evidence by which to evaluate the claim, see *Mitondo v. Mukasey*, 523 F.3d 784, 788 (7th Cir. 2008) (Easterbrook, C.J.).

[3] Under the REAL ID Act of 2005, credibility "determinations may be made 'without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim.'" *Amir v. Gonzales*, 467 F.3d 921, 925 n.4 (6th Cir. 2006) (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)). But

at 869. Here, while some of the inconsistencies the IJ identified in Jiang's testimony are irrelevant, others are significant, highly relevant, and supported by substantial evidence.

The first, and most serious, inconsistency in Jiang's testimony was Jiang's submission of a fake birth certificate for his daughter. The IJ saw this as "fatal" to Jiang's credibility. Submission of a fake document that relates to a critical part of an applicant's claim "creates serious doubts about the applicant's overall credibility" and "diminishes the reliability of the applicant's other evidence." *Sterkaj*, 439 F.3d at 277 (quoting *Selami*, 423 F.3d at 625). Put bluntly, an alien who submits a fraudulent document has a very difficult task in proving that he is nevertheless credible and entitled to relief because this court has "held repeatedly . . . that the submission of a fraudulent document in support of a key element of an [immigration] claim is sufficient to support an adverse credibility determination." *Selami*, 423 F.3d at 625 (citing cases). Here, Jiang admitted that his daughter's birth certificate was fake and obtained by bribery. The fraudulent submission certainly "goes to the heart" of his claims about persecution because his entire claim turns on China's coercive one-child policy. Documents related to the birth of his children are critical for determining whether he himself faces persecution for violating that policy.

The second relevant inconsistency is Jiang's contradictory statements over whether or not his wife was forced to have an abortion. Jiang's application for asylum stated that "[w]hen my wife got pregnant, the Birth Control Committee froced [sic] her to have an aboration [sic]." At the Merits Hearing, the government asked Jiang if anything happened to his wife other than the forcible

---

this new standard only applies to aliens who file for asylum or other relief after May 11, 2005. *Ibid.* Jiang filed his application in 2003, so this new, less-forgiving standard does not apply to him.

implantation of an IUD, and Jiang answered no. The IJ confronted Jiang with his application, and then repeatedly asked Jiang whether or not his wife had an abortion. Jiang then said that it was his sister-in-law who was forced to have an abortion, then gave a vague answer, then said that his wife was *not* forced to have an abortion; then, when asked yet again, Jiang said "let me think" before saying that "I guess it could be once." As the IJ recognized, this inconsistency is highly relevant to his claim of whether he suffered under China's coercive population-control policy, and furthermore it defies all human experience to think that someone could be confused over whether or not the authorities forced his wife to have an abortion.

Jiang's attempts to deflect this inconsistency fail. He blames the IJ for "badgering" him, but the record shows that the IJ was simply seeking clarification on this important issue. He also insists that the term "aboration" in his application for asylum was ambiguous and could have meant that his wife was forced to undergo an "operation" of some kind. Even if we assumed that "aboration" was vague, the context clears up any ambiguity because the entire sentence says that the "aboration" took place "after [Jiang's] wife became pregnant."

The third major inconsistency is Jiang's contradictory stories about the fate of his passport. Jiang's sworn statement on February 16, 2001, states that he obtained his passport from a smuggler and destroyed the passport once he boarded the plane to the United States. But Jiang submitted a passport for his Merits Hearing, and he testified at the hearing that he obtained the passport from the smuggler, gave it to the smuggler in the airport, and then the smuggler gave it back once Jiang paid the entire smuggling fee. Therefore, Jiang either lied to the immigration officer when he first entered the United States, or else he submitted a fake passport at the Merits Hearing and lied to the IJ. Jiang's

explanations for the discrepancy, that he "had a headache," and "was nervous" when he arrived in the United States, are not answers that *compel* a conclusion that Jiang was being honest.

IV

It is easy to sympathize with persons who have suffered under China's heavy-handed enforcement of its population-control policy. But this record does not come close to *compelling* us to conclude that Jiang has personally suffered from this policy in the past or that this policy threatens Jiang with a "clear probability of persecution" or a "more likely than not" risk of torture if he is returned to China. Thus, he is not entitled to withholding of removal or protection under the CAT, and the judgement of the Board of Immigration Appeals as to those issues is AFFIRMED. We lack jurisdiction to review the IJ's determination that Jiang's application for asylum was untimely, so Jiang's appeal as to that issue is DISMISSED.