NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0741n.06
Filed: December 3, 2008

No. 07-3940

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ANJEZA MYFTARI; SOKOL MYFTARI; BESA MYFTARI, | ) | |
| | ) | |
| Petitioners, | ) | ON PETITION FOR REVIEW |
| | ) | OF A DECISION OF THE |
| v. | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| MICHAEL B. MUKASEY, Attorney General, | ) | |
| | ) | |
| Respondent. | ) | |

BEFORE:    ROGERS, SUTTON, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.**  Anjeza Myftari, on behalf of herself and her husband, Sokol Myftari, and daughter, Besa Myftari, seeks review of an order of the Board of Immigration Appeals ("BIA") upholding the Immigration Judge's ("IJ") denial of her application for asylum, withholding and removal, and protection under the United Nations Convention Against Torture ("CAT"). Because substantial evidence supports both the IJ's and the BIA's decision, we **DENY** the petition for review.

## I

The Myftaris are natives and citizens of Albania. Mrs. Myftari and her daughter entered the United States without valid travel documents on October 29, 2001. Mr. Myftari entered the United States pursuant to a nonimmigrant visitor visa on May 13, 2002.

In July 2002, Mrs. Myftari affirmatively sought asylum with the Immigration & Naturalization Service,[1] listing her husband and daughter as derivative beneficiaries. She alleged that she was persecuted and would face future persecution on the basis of her husband's affiliation with the Democratic Party ("DP") in Albania. Her application was denied, and the matter was referred to an IJ for removal proceedings. Notices to Appear charged Mrs. Mfytari and her daughter with removability for entry without valid travel documents, *see* 8 U.S.C. § 1182(a)(7)(A)(i), and Mr. Myftari for overstaying his visa, *see* 8 U.S.C. § 1227(a)(1)(B). At the master calendar hearing in December 2002, the Myftaris admitted the factual allegations contained in the Notices to Appear and conceded removability. Mrs. Myftari renewed her application for asylum, and alternatively sought withholding of removal and protection under the CAT.

A merits hearing was held on August 30, 2005, September 14, 2005, and November 15, 2005. Mrs. Myftari testified that she and Sokol Myftari became engaged in June 1998 and were married in January 1999.[2] In August 1997, Mr. Myftari apparently took over his father's business of running a three-story hotel/restaurant located in Tirana, Albania. The Myftaris remodeled the business and held a grand opening in January 1998. Mrs. Myftari worked alongside her husband at the restaurant.

Mrs. Myftari testified that her husband was an openly active member and financial supporter of the DP in Albania. A membership card confirmed that he had been a member of the DP since

---

[1] The INS was the agency responsible for immigration matters at the time of Mrs. Myftari's affirmative asylum application. On March 1, 2003, the functions of the former INS were transferred from the Department of Justice to the newly-established Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-926, 116 Stat. 2135 (Nov. 25, 2002).

[2] Although the marriage ceremony occurred in January 1999, the marriage was not registered until September 2000.

1992.  Further, the DP's headquarters was near Mr. Myftari's restaurant, and members of the party often patronized the restaurant and held meetings there.

According to Mrs. Myftari, her husband was home ill in June 1997, before the elections in which the Socialist Party ("SP") came to power in Albania in August 1997.[3]  At that time, the SP and the DP were fighting for power.  Mrs. Myftari testified that a family friend volunteered to obtain some medication for Mr. Myftari, and that when the friend went to enter the Myftaris' vehicle, an explosive detonated.  The friend was injured and the vehicle was destroyed.  However, Mrs. Myftari admitted that she did not attempt to obtain an affidavit confirming this incident from the injured friend.  The Myftaris also apparently reported the explosion to the police, but they did not know if any investigation was conducted.  The Myftaris testified that they believed members of the SP were responsible for the bombing.  Mrs. Myftari testified that the police told her that such things would happen if she was going to support the DP.  But Mr. Myftari ultimately admitted that he did not know who had bombed his vehicle.

On April 7, 1999, after the SP had won the elections and gained power, the Myftaris testified that they received an anonymous letter under their door demanding payment of $150,000.  One week later, Mr. Myftari received an anonymous telephone call at their home regarding the letter.  Mr. Myftari told the caller he did not have the money.  The caller apparently said that they had six months to pay the money.  Mrs. Myftari initially testified that they received only one telephone call

---

[3]The SP evolved out of the former Communist Party in Albania in 1991.

after receiving the letter, but she later recalled that they received a second call in October 1999. She testified that the second caller threatened that their business would be destroyed if they did not pay.[4]

In the meantime, in December 1999, the Myftaris received an order from the Albanian government informing them that their business would be destroyed because they had remodeled it without permission. The Myftaris testified that they did have permits to remodel the property. Mr. Myftari explained that they had obtained these permits in 1997, when the DP was in power, but the government apparently refused to recognize the previously issued permits. The Myftaris and Mrs. Myftari's father apparently made several efforts to prevent the destruction of the business. But it was ultimately destroyed in January 2000—one month after they received the government order and three months after the second telephone call requesting payment of $150,000.[5] The Myftaris both testified that they believed the destruction of the business was connected to the SP and the demands for money.

On September 9, 2001, Mrs. Myftari testified that she and her then-two-year-old daughter were kidnaped while returning from a friend's nearby home. She testified that two men approached her and her daughter, grabbed them, rendered them unconscious with some sort of chemical, and

---

[4]Mrs. Myftari first testified that the first caller had also threatened to destroy their business, but she later testified that the threat came only in the second call. The first caller apparently only demanded payment of the money.

[5]At the hearing, there was some confusion as to some of the proof Mrs. Myftari offered of the building's destruction. She submitted a certificate from the Ministry of Public Works dated "10.04.2001" stating that "The Construction Police, Branch of Tirana, under decision no. 4, dated 16.02.1999, destroyed a Building (Bar) . . . property of Mr. SOKOL MYFTARI." J.A. at 636. Mrs. Myftari testified that this certificate was the original document she had received in February 2000. However, when the IJ asked her how she could have obtained the document in 2000 when it bore a date from 2001, Mrs. Myftari stated that the original 2000 certificate was in Albania and that her husband had brought the 2001 certificate when he came to the United States.

pushed them into the back seat of a vehicle. When Mrs. Myftari woke up, she testified that her hands and feet were tied and she heard the men talking about selling her and her daughter for prostitution. She and her daughter were eventually put on a boat with other women and children. The boat was stopped by the Italian border patrol, and Mrs. Myftari told them that she had been kidnaped. She and her daughter were then able to voluntarily return to Albania.

When asked about proof of the kidnaping, Mrs. Myftari testified that the Italian border patrol agents wrote out a report, but she did not attempt to obtain a copy of it because she was in a state of shock. She also testified that she reported the kidnaping to the authorities in Vlora, Albania, at which point she was told that the incident had already been reported to them by the Italian authorities. Mrs. Myftari admitted that a written report was produced by the Albanian authorities, but she had not obtained or submitted it because she had to be physically present in Albania to obtain it.

As to any connection between her kidnaping and the SP, Mrs. Myftari admitted that her kidnapers did not identify themselves or say they were from the SP. She did testify that she heard the two men discussing their boss, who had a lot of money and had connections with the police department. The men apparently told Mrs. Myftari that the police would take care of them. Mrs. Myftari admitted that the men did not mention the words "Socialist" or "Socialist Party," but she testified that she assumed they were connected to the SP because that was the party in power at the time of the kidnaping.

After the kidnaping incident, Mrs. Myftari purchased fake passports for herself and her daughter, and they left Albania for the United States in October 2001.

At the merits hearing, both Mr. and Mrs. Myftari testified that they feared returning to Albania because of the unstable conditions there. Mrs. Myftari's father also expressed this sentiment. According to Mrs. Myftari, the kidnaping of women and children was still common. The Myftaris also feared mistreatment on the basis of their political affiliations and opinions, despite the fact that the DP had regained power in Albania in the summer of 2005.

The IJ found the Myftaris removable and denied Mrs. Myftari's applications for asylum, withholding of removal, and protection under the CAT. The IJ first found that the Myftaris were not credible. In addition to detailing a number of specific inconsistencies and omissions in their testimony, she noted the "lack of reasonably expected corroborating evidence." J.A. at 85. Moreover, the IJ found that the Myftaris failed to establish a nexus between their alleged past persecution and their political opinion.[6] The IJ also noted that there had been a change in country conditions in Albania such that even if the Myftaris were found credible and established past persecution, they would not be able to show a well-founded fear of future persecution. To the extent that the Myftaris claimed they still feared persecution in Albania, the IJ found their testimony too vague, speculative, and imprecise to establish a well-founded fear. The IJ specifically noted that Mr. Myftari had a personal relationship with Sali Berisha, the leader of the DP in Albania.

Mrs. Myftari appealed the IJ's decision to the BIA, and the BIA affirmed. It found "no clear error in the Immigration Judge's adverse credibility determination." J.A. at 3. It then "affirm[ed] the Immigration Judge's alternative determination that the respondents failed to establish a nexus

---

[6]Both the IJ and the BIA referred to the Myftaris as "respondents" and discussed the "respondents'"—plural—failure to establish eligibility for asylum. Because Mrs. Myftari was the lead applicant and Mr. Myftari and their daughter were only listed as derivative beneficiaries of the application, we will only refer to Mrs. Myftari's—singular—eligibility for asylum.

between the harm they suffered or fear in Albania and a protected ground." *Id.* Because the Myftaris could not satisfy the lower burden of proof required for asylum, the BIA also concluded that they had failed to satisfy the "clear probability" standard required for withholding of removal or the "more likely than not" standard required for protection under the CAT. J.A. at 4. Finally, the BIA rejected a due process challenge to the IJ's conduct at the merits hearing, finding no evidence that the IJ was biased or that the Myftaris had been denied a full and fair opportunity to present their claims for relief from removal. *Id.* Mrs. Myftari filed a timely petition for review of the BIA's decision with this court.

## II

Mrs. Myftari makes essentially two arguments in her petition for review. First, she argues that she has established her eligibility for asylum.[7] In support of this argument, she challenges the IJ's adverse credibility determination and also argues that she demonstrated past persecution in Albania as a result of her husband's association with the DP. Second, Mrs. Myftari contends that the IJ's failure to take the oath of the Albanian interpreter at the second merits hearing and the interpreter's indiscernible and incoherent translations denied her due process of law.

---

[7]In her petition for review, Mrs. Myftari does not explicitly challenge the denial of her applications for withholding of removal or protection under the CAT. Even if she did, Mrs. Myftari's failure to show a well-founded fear of persecution based on political opinion—which precludes her eligibility for asylum—would also preclude her eligibility for withholding of removal. *Castellano-Chacon v. INS*, 341 F.3d 533, 545 (6th Cir. 2003) (noting that a "greater quantum of proof is required as to the likelihood of persecution in the country of risk in order to establish eligibility for withholding" as opposed to asylum). Mrs. Myftari's failure to show a future threat in Albania would also preclude her eligibility for protection under the CAT. Although an applicant for CAT protection need not "link the harm faced with any of the five protected grounds enumerated in relation to applications for asylum and withholding," an applicant still must establish that she would "more likely than not" be tortured if removed to her country of origin. *Id.* at 551. Mrs. Myftari cannot satisfy this strict standard.

-7-

## A. Standard of Review

Where, as here, the BIA has adopted the IJ's decision with additional commentary, "we review the decision of the IJ, as supplemented by the BIA, as the final administrative order." *Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007). We review questions of law *de novo. Id.* But we review factual findings under the deferential "substantial evidence" standard. *Id.*; *see also Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008). Under this standard, the administrative findings of fact are "conclusive" unless "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008).

## B. Eligibility for Asylum

Mrs. Myftari first challenges the administrative decision that she did not adequately establish her eligibility for asylum. The Attorney General has discretion to grant asylum to a "refugee." 8 U.S.C. § 1158(b)(1)(B)(i). A refugee is a person who is outside her country of nationality and who is unable or unwilling to return to that country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

To establish past persecution, an applicant must show that she "was specifically targeted by the government for abuse based on one of the statutorily protected grounds." *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005). An applicant's demonstration of past persecution creates a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1); *Ceraj*, 511 F.3d at 592. This presumption can be rebutted—and asylum denied—only if the government establishes "by a preponderance of the evidence that since the persecution occurred, conditions in the applicant's

country have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he were to return."[8] *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998) (internal quotation marks omitted); *see also* 8 C.F.R. § 208.13(b)(1)(i)(A) (providing that asylum shall be denied if "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality"). Alternatively, an applicant can obtain asylum based on a well-founded fear of future persecution "by showing that the fear is subjectively genuine and objectively reasonable." *Zoarab*, 524 F.3d at 780.

## 1. Adverse Credibility Determination

The testimony of an asylum applicant may be sufficient to establish past persecution or a well-founded fear of future persecution, but only if the trier of fact finds that testimony credible. 8 U.S.C. § 1158(b)(1)(B)(ii); *Ndrecaj v. Mukasey*, 522 F.3d 667, 674 (6th Cir. 2008). We review an adverse credibility determination, as a factual finding, for substantial evidence. *Ceraj*, 511 F.3d at 591; *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006). An IJ may base a credibility determination on the totality of circumstances and "all relevant factors," including the applicant's demeanor, candor, the consistency and plausibility of her account, and the consistency between written and oral statements. 8 U.S.C. § 1158(b)(1)(B)(iii). However, a credibility determination "must be supported by specific reasons and must be based upon issues that go to the heart of the applicant's claim." *Ramaj*, 466 F.3d at 527; *see also Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004).

---

[8]In certain circumstances, an applicant for asylum who "has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution" may be granted asylum in the absence of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1)(iii)(A). Mrs. Myftari does not contend that this provision applies in her case.

Discrepancies that cannot be viewed as "attempts by the applicant to enhance his claims of persecution" have no bearing on credibility.[9] *Sylla*, 388 F.3d at 926.

Here, substantial evidence supports the adverse credibility determination. The IJ cited specific reasons for its determination that the Myftaris were not credible, and these reasons went to the heart of Mrs. Myftari's claim for asylum. For example, the IJ noted that Mrs. Myftari's original asylum application never mentioned her husband's participation in a political demonstration in Albania in 1991, during which Mr. Myftari was apparently injured and almost killed. This incident was raised for the first time at the beginning of Mr. Myftari's testimony at the merits hearing. The IJ stressed the importance of this inconsistency, given the fact that the entire basis of Mrs. Myftari's claims was her husband's activities with the DP. Moreover, the written asylum application did not state that a prominent member of the SP offered to buy Mr. Myftari's business for an extremely low sum of money approximately one month before the business was destroyed. This event, too, was not raised until Mr. Myftari testified at the merits hearing. And even when Mr. Myftari did testify, the IJ noted that Mr. Myftari's various explanations for neglecting to include the incident in the written asylum application were unpersuasive.

The IJ also recognized the discrepancy between Mrs. Myftari's testimony that the friend who was injured in the vehicle bombing was going to obtain medicine, and statements in the written asylum application that the friend was going to pick up a doctor. Although the IJ acknowledged that

---

[9]The REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 (codified in scattered sections of 8 U.S.C.), provides that credibility determinations may be made "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii). However, this provision applies only to applications filed on or after May 11, 2005, *Amir v. Gonzales*, 467 F.3d 921, 925 n.4 (6th Cir. 2006), and accordingly does not apply in this case.

this itself was not a critical inconsistency, the IJ stated that she had "carefully observed" Mr. Myftari's demeanor when questioned about it, and that Mr. Myftari appeared to make up an explanation after several leading questions by his attorney. Further, the IJ noted Mrs. Myftari's inconsistent testimony as to the number of threatening telephone calls they received after the letter demanding $150,000 had been slipped under their door. At first, Mrs. Myftari stated they had only received one call, but she later changed her testimony and stated that they had received two calls.

In addition, the IJ noted the lack of corroborating evidence offered by Mrs. Myftari, including her failure to obtain any affidavit from the injured friend confirming the explosion and her failure to obtain police reports related to her alleged kidnaping. Given that the lack of corroborating evidence to support an asylum applicant's statements is a factor that can be taken into account in a credibility determination, *see Berri v. Gonzales*, 468 F.3d 390, 395-96 (6th Cir. 2006), these facts, too, support the IJ's determination that Mrs. Myftari's story was not credible.

Even assuming that some of the other more minor inconsistencies identified by the IJ—such as discrepancies regarding dates—did not go to the heart of Mrs. Myftari's claim for asylum, the IJ identified enough serious inconsistencies in the testimony of both Mr. and Mrs. Myftari. Even if there may have been other explanations for these inconsistencies, we cannot say that any reasonable adjudicator would have been compelled to conclude that the Myftaris were credible. Accordingly, we affirm the IJ's adverse credibility determination.

## 2. Past Persecution and Well-Founded Fear of Future Persecution

Although the IJ's adverse credibility finding itself would have precluded a finding of past persecution or a well-founded fear of future persecution, the IJ offered two alternative bases for its denial of asylum: 1) Mrs. Myftari failed to show a nexus between any past persecution and political

opinion, and 2) even if she could show such a nexus, there had been such a change in the conditions in Albania that she could not establish a well-founded fear of future persecution. We review an administrative determination that the petitioner failed to establish eligibility for asylum for substantial evidence. *Ceraj*, 511 F.3d at 588.

First, we note briefly that Mrs. Myftari did not present enough evidence to compel the conclusion that she suffered past persecution on account of political opinion.[10] Both she and Mr. Myftari admitted that they did not know who placed a bomb in their vehicle. They also both admitted that the letter demanding payment of $150,000 was anonymous. Further, there was an alternative explanation for the destruction of their business: failure to obtain the proper permits for remodeling. Mrs. Myftari also admitted that neither of her kidnapers mentioned the word "Socialist," nor did they give her any reason to believe that they were members of the SP or that they were kidnaping her because of her or her husband's association with the DP. And as the BIA concluded, a reasonable adjudicator could have concluded that much of the alleged persecution was motivated more by the Myftaris' perceived wealth and ability to pay, not their political opinion.

But even were we to conclude that Mrs. Myftari could establish past persecution on account of political opinion, substantial evidence supports the conclusion that changed conditions in Albania rebutted any presumption of a well-founded fear of future persecution. As both the IJ and the BIA

---

[10]We also recognize that political opinions for which Mrs. Myftari claims to have been punished are in fact her husband's; as a result, her claim could be characterized as one based on imputed political opinion. Indeed, it is curious that Mrs. Myftari, and not her husband, was the lead applicant for asylum. Neither this court nor the Supreme Court has decided whether imputed political opinions may form the basis of an asylum claim. *See Pascual v. Mukasey*, 514 F.3d 483, 486 (6th Cir. 2007). We need not resolve that question today, however, because Mrs. Myftari has not established that any alleged persecution was on account of her political opinion, "imputed or otherwise." *Id.* at 487.

noted, the record evidence of country conditions in Albania indicated that the DP returned to power after the general elections in 2005, and the Myftaris admitted this fact. We have "repeatedly concluded that the conditions in Albania have improved to such an extent that there is no objective basis for a well-founded fear of future persecution based on political . . . beliefs." *Ceraj*, 511 F.3d at 593; *see also Ndrecaj*, 522 F.3d at 676 ("[O]n the basis of published reports of Albania's political development, we have previously stated that the conditions in Albania are 'fundamentally changed.'"); *Ramaj*, 466 F.3d at 531 ("[C]ountry conditions in Albania have improved to the point that any presumption of a well-founded fear of future persecution is rebutted.").

As a result of these changed conditions, Mrs. Myftari's subjective fears of returning to Albania were insufficient to support an objectively reasonable fear of future persecution, let alone to compel such a finding. An applicant "cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but instead must offer reasonably specific information showing a real threat of individual persecution." *Ndrecaj*, 522 F.3d at 676 (quoting *Mapouya v. Gonzales*, 487 F.3d 396, 412 (6th Cir. 2007)). And the possibility that the SP may return to power at some unspecified time in the future was much too speculative. *See id.* (noting that applicant who feared that Socialists would return to power in Albania in the future lacked a well-founded fear of persecution).

Because the IJ's and the BIA's alternative conclusions each provide an independent basis for the denial of asylum, we affirm the administrative decision on those grounds as well.

**C. Due Process Claim**

Finally, Mrs. Myftari argues that she was deprived of a full and fair hearing because the IJ did not put the Albanian language interpreter under oath at the second merits hearing and because several of the interpreter's translations appeared as incoherent, incomplete, and indiscernible in the

transcript.[11] However, we lack jurisdiction to consider Mrs. Myftari's due process claim because she did not raise it before the BIA.

We only have the authority to review claims properly presented to the BIA and considered on the merits. *Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006); *see* 8 U.S.C. § 1252(d)(1) (providing that federal courts cannot exercise jurisdiction over an appeal of a final order of removal where the alien has failed to exhaust all administrative remedies). "Although an alien's due process challenge generally does not require exhaustion . . . , the alien must raise correctable procedural errors to the BIA." *Sterkaj*, 439 F.3d at 279. All of Mrs. Myftari's claims involving the interpreter's oath and the quality of the interpretation and transcription could have been raised before, and corrected by, the BIA. *See Sedrakyan v. Gonzales*, 237 Fed. Appx. 76, 79-80 (6th Cir. 2007) (refusing to address petitioner's due process argument regarding translation problems because petitioner failed to raise it with the BIA); *Cela v. Gonzales*, 205 Fed. Appx. 376, 384-85 (noting that the court lacked jurisdiction to review petitioner's due process claims involving inadequate interpretation because of petitioner's failure to exhaust administrative remedies). Accordingly, Mrs. Myftari's failure to exhaust her administrative remedies keeps us from reviewing the merits of her due process claims.

### III

For the foregoing reasons, we **DENY** the petition for review.

---

[11]In one sentence of her brief, Mrs. Myftari also asserts that the IJ chilled the witnesses' right to testify by questioning them at the hearing. Pet'r Br. at 13. Because she does not develop this argument any further, she has waived it. *United States v. Sandridge*, 385 F.3d 1032, 1035 (6th Cir. 2004) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").