NOT RECOMMENDED FOR PUBLICATION
File Name: 10a0039n.06

No. 08-3856

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Jan 25, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| MUSA KAMARA, | **)** | |
| | **)** | |
| Petitioner, | **)** | ON PETITION FOR REVIEW OF AN |
| | **)** | ORDER OF THE BOARD OF |
| v. | **)** | IMMIGRATION APPEALS |
| | **)** | |
| ERIC H. HOLDER, JR., Attorney General, | **)** | OPINION |
| | **)** | |
| Respondent. | **)** | |
| | **)** | |

**Before: BOGGS and GILMAN, Circuit Judges; and McCALLA, Chief District Judge.**[*]

**RONALD LEE GILMAN, Circuit Judge.** Musa Kamara, a 34-year-old native and citizen of Sierra Leone, appeals a decision by the Board of Immigration Appeals (BIA) that denied his application for asylum, withholding of removal, and protection under the United Nation's Convention Against Torture (CAT). His claims are primarily based on the mistreatment he allegedly suffered after refusing to join a rebel group in Sierra Leone. For the reasons set forth below, we **DENY** the petition for review.

## I. BACKGROUND

### A. Factual background

---

[*]The Honorable Jon P. McCalla, United States Chief District Judge for the Western District of Tennessee, sitting by designation.

Kamara was born in Sierra Leone in October 1975. (App. 89-90) He lived with his mother and father on a fruit and livestock farm, but he testified that his family had "no money." (App. 92) In 2000, four rebels from the Revolutionary United Front (RUF) came to Kamara's home and asked his father for money and diamonds. (App. 93, 95, 107) After his father said that they did not have any money or diamonds, the rebels beat his father "very bad[ly]." (App. 93) Kamara said that the rebels targeted his home because his father sold goats and sheep. (App. 99)

The RUF rebels then took Kamara from the farm, put him in a car, and drove him to a prison. (App. 96-97) Kamara testified that at the prison, the guards beat him everyday, threw him to the floor, and used a large piece of wood to beat one of his legs. (App. 98, 100) During his imprisonment, the RUF repeatedly asked Kamara to join them, but he refused. (App. 100) Kamara was held in the prison for four months until soldiers from Guinea came and took him back to Guinea, where he stayed for two days. (App. 100, 103)

According to Kamara, "[t]his one old guy" in Guinea gave him money and sent him to Mali, where another individual gave him money to fly to the United States. (App. 104-105) After Kamara arrived in the United States using a fraudulent passport in August 2001, a man named Malik, who had previously lived near Kamara's family in Sierra Leone, told Kamara that his father had passed away after the rebels took Kamara. (App. 113) Kamara's mother is currently missing. (App. 145)

**B.    Procedural history**

Kamara timely filed an asylum application, in which he claimed past persecution on account of race, religion, and nationality, but did not indicate persecution on account of membership in a

particular social group or political opinion. (App. 148) At the June 2006 merits hearing before an immigration judge (IJ), however, Kamara's counsel indicated that Kamara was claiming persecution on account of a political opinion imputed to him after he refused to join the RUF. (App. 135)

The IJ ultimately found Kamara to be not credible because he gave vague and inconsistent testimony, did not know the answers to important questions such as what the acronym RUF stands for, and gave answers that seemed unreasonable under the circumstances. (App. 45-48) Moreover, the IJ concluded that even if he were credible, Kamara had not established past persecution or a well-founded fear of future persecution, primarily because he did not establish the required nexus. That is, Kamara did not prove that the RUF imputed a political opinion to him and that his mistreatment was "on account of" this imputed political opinion. (App. 51-52)

The IJ also found that Kamara's fear of future persecution was not objectively reasonable because Sierra Leone is now a significantly safer country than when Kamara left in 2000. (App. 51) Because Kamara had not established eligibility for asylum, the IJ denied the withholding of removal as well. Finally, the IJ found that Kamara was not eligible for protection under the CAT because Kamara's detainment by the RUF and accompanying beatings did not rise to the level of torture and did not establish that he was more likely than not to be tortured if he were returned to Sierra Leone. (App. 55)

The BIA dismissed Kamara's appeal. Even after giving Kamara the benefit of the doubt by assuming that he was credible, the BIA agreed with the IJ that Kamara had failed to establish a nexus between his mistreatment and an imputed political opinion. (App. 7) It also found that he had not

established a reasonable fear of future persecution, eligibility for withholding of removal, or any basis for protection under the CAT. Finally, it rejected Kamara's argument that various errors the IJ allegedly committed during the merits hearing denied him due process. (App. 8-9)

## II.  ANALYSIS

### A.  Standard of review

"Because the BIA adopted the IJ's decision with additional commentary, we review the decision of the IJ, as supplemented by the BIA, as the final administrative order." *Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007). We review the factual determinations of the IJ under the "substantial evidence" test. *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004). Under this standard, we will not reverse a factual determination unless "the evidence not only supports a contrary conclusion, but *compels* it." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (emphasis in original).

### B.  Asylum

Kamara first claims asylum based on the past persecution that he allegedly suffered after refusing to join the RUF. An alien who seeks asylum must establish that he meets the definition of a "refugee," which means a person unable or unwilling to return to his country because of past persecution or a "well-founded fear" of future persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." Immigration and Nationality Act (INA) § 101(a)(42); 8 U.S.C. § 1101(a)(42). The burden of proof is on Kamara to establish that he

meets this definition. *See* INA § 208(b)(1)(B)(i); 8 U.S.C. § 1158(b)(1)(B)(i). Because the BIA analyzed Kamara's claims on the assumption that his testimony was credible, we will do so as well.

The IJ and the BIA concluded that Kamara had not established past persecution because he did not demonstrate a connection between his mistreatment and one of the five protected statutory grounds. These findings are supported by substantial evidence. The record reflects two instances of mistreatment suffered by Kamara—first, when the RUF came to his home and beat his father, and second, when the RUF detained and beat Kamara for four months. Kamara presented no evidence that either instance of mistreatment was motivated by a political opinion held by Kamara or his family, whether actual or imputed. Rather, Kamara testified that the RUF rebels came to his home because they viewed his family as wealthy.

Moreover, Kamara's confinement and beatings at the prison were aimed solely at forcing Kamara to join the RUF. The evidence therefore establishes that Kamara experienced mistreatment as a result of the *RUF*'s political opinions, not his own. When the Supreme Court reversed the Ninth Circuit's holding that mistreatment by Guatemalan guerrillas in an attempt to recruit an individual establishes persecution "on account of" political opinion, it made this same distinction:

> As for the Court of Appeals' conclusion that the guerrillas' "motive in carrying out the kidnapping is political": It apparently meant by this that the guerrillas seek to fill their ranks in order to carry on their war against the government and pursue their political goals. But that does not render the forced recruitment "persecution on account of . . . political opinion." . . . The ordinary meaning of the phrase "persecution on account of . . . political opinion" in § 101(a)(42) is persecution on account of the *victim's* political opinion, not the persecutor's. If a Nazi regime persecutes Jews, it is not, within the ordinary meaning of language, engaging in persecution on account of political opinion; and if a fundamentalist Moslem regime persecutes democrats, it is not engaging in persecution on account of religion. Thus,

the mere existence of a generalized "political" motive underlying the guerrillas' forced recruitment is inadequate to establish (and, indeed, goes far to refute) . . . persecution *on account of* political opinion, as § 101(a)(42) requires.

*INS v. Elias-Zacarias*, 502 U.S. 478, 482 (1992) (emphasis in original) (internal citations omitted).

Kamara's asylum claim is barred by *Elias-Zacarias* because he has presented no evidence as to the motive of the RUF in detaining and beating him other than that they were trying to recruit him. As a result, Kamara is not eligible for asylum based on past persecution because he has not established that any alleged past persecution was "on account of" his political opinion or any other protected ground.

Kamara next claims asylum based on a well-founded fear of future persecution by the RUF if he were to return to Sierra Leone. (Pet's Br. 45) But because Kamara did not demonstrate past persecution, he is not entitled to a presumption of a well-founded fear of future persecution. *See Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998). A well-founded fear of future persecution "must be both subjectively genuine and objectively reasonable." *Abay v. Ashcroft*, 368 F.3d 634, 637 (6th Cir. 2004) (citation omitted).

The findings of the IJ and the BIA that Kamara does not have a well-founded fear of future persecution are supported by substantial evidence. Although Sierra Leone is not yet entirely free of political strife, its conditions have significantly improved since the end of the civil war in 2002, and the RUF now wields substantially less power. (App. 159-174) More importantly, Kamara has again failed to meet the nexus requirement. That is, he has submitted no evidence to demonstrate that if he were persecuted in Sierra Leone by the RUF upon his return, it would be "on account of" a

political opinion that he holds. When asked why the RUF rebels would want to hurt him, Kamara at first said "I don't know," but then answered "[b]ecause . . . I don't want to join them." (App. 106)

This evidence is not sufficient to establish a well-founded fear of future persecution because such future mistreatment would be on account of the persecutor's political opinion, not the victim's. *See Elias-Zacarias*, 502 U.S. at 482 (rejecting a claim of well-founded fear of future persecution that was based on the applicant's refusal to fight with guerrilla forces in Guatemala); *see also Lumaj v. Gonzales*, 462 F.3d 574, 578 (6th Cir. 2006) (rejecting a claim of well-founded fear of future persecution because although a widespread threat of violence existed in Albania, there was no evidence that individuals were targeted on political grounds).

Moreover, Kamara did not establish that he would be singled out for mistreatment among the general population. When asked why he would have problems if he returned to Sierra Leone, he said "[t]hey still have bad people there" and that a lot of people go missing. (App. 106) Kamara, however, "cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but instead must offer reasonably specific information showing a real threat of *individual* persecution." *See Mapouya v. Gonzales*, 487 F.3d 396, 412 (6th Cir. 2007) (emphasis added) (citations omitted). He has not satisfied this standard. The record is devoid of evidence that he faces an individualized threat beyond the general threat to the population from "bad people." Kamara therefore has not met his burden to prove eligibility for asylum based on a well-founded fear of future persecution.

On appeal, Kamara argues for the first time that he is also eligible for asylum based on past persecution and a well-founded fear of future persecution on account of his membership in the social group of people perceived as wealthy in Sierra Leone by abusive and corrupt government security forces. (Pet's Br. 37) Kamara has failed to administratively exhaust this argument, however, because he did not raise it in his brief before the BIA. We therefore lack jurisdiction to review this claim. *See* INA § 242(d)(1); 8 U.S.C. § 1252(d)(1); *Ramani v. Ashcroft*, 378 F.3d 554, 560 (6th Cir. 2004) (holding that "only claims properly presented to the BIA and considered on their merits can be reviewed by this court").

Because Kamara did not demonstrate his eligibility for asylum, his claim for withholding of removal fails. If an applicant has not established past persecution, a claim for withholding requires evidence that "it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal." 8 C.F.R. § 1208.16(b)(2). This standard is more demanding than the standard required to establish asylum. *Sarr v. Gonzales*, 485 F.3d 354, 362 (6th Cir. 2007). Kamara did not meet the burden of showing future persecution for asylum purposes and therefore cannot meet the higher burden needed to qualify for withholding of removal. *See id.* (rejecting a claim for withholding of removal because the applicant did not meet the more lenient standard for asylum).

## C.     Protection under the CAT

In order to qualify for protection under the CAT, Kamara must demonstrate that it is "more likely than not" that he would be tortured if he were removed to Sierra Leone. *See Pilica v. Ashcroft*,

388 F.3d 941, 951 (6th Cir. 2004) (quoting 8 C.F.R. § 208.16(c)(2)).  Kamara supports his CAT claim with two pieces of evidence.  He first relies on the 2005, 2006, and 2007 State Department Country Reports for Sierra Leone, which he claims confirm "the risk of torture" that he faces if he returns to Sierra Leone.  (Pet's Br. 33)

As an initial matter, even if these reports establish a *risk* of torture as Kamara claims, this does not mean that it is "more likely than not" that *he* will be tortured, particularly because the problems enumerated in the reports were listed as exceptions to the general statement that "[t]he government generally respected the human rights of its citizens."  (App. 159)  Moreover, many of the concerns listed in the reports would either not apply to Kamara or would not rise to the level of torture.  Kamara, for example, would not be subject to child labor, female genital mutilation, or abuse as a journalist.  And other problems mentioned in the reports, such as poor prison conditions, police theft and extortion, a corrupt judiciary, and insufficient legal representation, generally do not amount to torture.  *See* 8 C.F.R. § 1208.18(a)(2) ("Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of . . . punishment that do not amount to torture.").

Kamara next relies on his past mistreatment while being held at the RUF prison in Sierra Leone.  (Pet's Br. 31)  Even assuming that this past mistreatment constituted torture, it does not establish that it is "more likely than not" that Kamara would be tortured in the future.  Kamara failed to point to any evidence that suggests that this past mistreatment would be repeated.  In particular, Kamara has presented no evidence to rebut the government's proof regarding the improvement in country conditions since 2001, the efforts of the Sierra Leone government to protect its citizens from

the small remaining remnants of the RUF, the failure of the RUF to gain any political power in recent elections, and the successful trials of the leadership of the RUF, all of which suggest that Kamara does not face torture by the RUF if he were to return.  (App. 159, 160, 163, 167, 168)

**D.     Kamara's due process arguments**

Beyond challenging the decisions of both the IJ and the BIA, Kamara argues that the proceedings violated his Fifth Amendment due process rights.  Due process requires that aliens receive a full and fair hearing.  A due process violation occurs, however, only where "the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case." *Hassan v. Gonzales,* 403 F.3d 429, 436 (6th Cir. 2005) (quoting *Ladha v. INS,* 215 F.3d 889, 904 (9th Cir. 2000)).   In order to succeed on his due process claim, Kamara must demonstrate "substantial prejudice." *Gishta v. Gonzales,* 404 F.3d 972, 979 (6th Cir. 2005).  To meet this standard, he must show that any alleged due process errors actually affected the outcome of his proceedings. *Id*.

Kamara first argues that the IJ and the BIA violated his due process rights "by pre-judging the case" and "by issuing decisions which lack clear administrative findings."  (Pet's Br. 23)  These claims are without merit.  There is no evidence that either the IJ or the BIA prejudged the case.  Similarly, both the IJ and the BIA issued clear and well-reasoned opinions that included citations to the relevant statutes and caselaw, as well as specific references to the testimony and other evidence presented at Kamara's merits hearing.

Next, Kamara alleges that the BIA erred in "ignoring deficiencies" in the merits hearing transcript. (Pet's Br. 23) The transcript does reflect that certain responses by Kamara were "indiscernible" to the transcriber. But in some instances, the IJ or Kamara's counsel followed up on the indiscernible response with a subsequent question that ultimately clarified the response. In most of the other instances, the indiscernible responses are irrelevant to the evidence needed to establish Kamara's claims, relating instead to the legal status of his wife, Kamara's education, money he received from certain individuals once he arrived in the United States, the conversation he had in the United States in which he learned that his father was dead, or Kamara's credibility. The core part of Kamara's story—that the RUF came to his home because they thought his family was wealthy, that the RUF beat his father, and that they took Kamara to a prison where he was held and beaten for four months because he refused to join them—is clear from the transcript.

Contrary to Kamara's assertions, therefore, none of the transcript deficiencies affected the outcome of his case. They do not relate to the RUF's motive in coming to Kamara's home and beating his father. Nor do they bear on why the RUF detained and beat Kamara for four months. Finally, they are irrelevant to whether Kamara would be singled out for torture by the RUF if he is returned to Sierra Leone.

In his final argument on appeal, Kamara contends that the IJ and the BIA erred in not giving any weight to a letter from his doctor that states that the scars on Kamara's body are consistent with his having received multiple beatings. (App. 154-55) But this alleged error did not prejudice Kamara because the letter does not address any of the critical lapses in his claims. Kamara's past-

persecution claim fails not because the mistreatment he experienced was insignificant, but because he failed to establish a nexus between that mistreatment and any imputed political opinion. Similarly, Kamara did not demonstrate a well-founded fear of future persecution because of the lack of a nexus to any individualized threat. Finally, his CAT claim fails because the Country Reports show improved conditions within Sierra Leone and demonstrate that the RUF retains little power. These were the critical lapses in Kamara's claims, and the doctor's letter addresses none of them. Kamara thus has not demonstrated prejudice as a result of this alleged error.

### III. CONCLUSION

For all of the reasons set forth above, we **DENY** Kamara's petition for review.