NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0455n.06

No. 21-4105

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JIMMY SAGASTUME-HERNANDEZ,

    Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

    Respondent

)
)
)
)
)
)
)
)
)
)
)

**FILED**
Nov 10, 2022
DEBORAH S. HUNT, Clerk

ON PETITION FOR REVIEW
FROM THE UNITED STATES
BOARD OF IMMIGRATION
APPEALS

---

Before: McKEAGUE, WHITE, and MURPHY, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Petitioner Jimmy Sagastume-Hernandez, a native and citizen of Honduras, seeks review of a Board of Immigration Appeals order denying his application for asylum, withholding of removal, and protection under the Convention Against Torture. Because Sagastume-Hernandez has not shown an entitlement to relief, the petition is DENIED.

## I.

Sagastume-Hernandez entered the United States without immigration documentation in July 2014. Shortly after, the Department of Homeland Security initiated removal proceedings against him. Sagastume-Hernandez conceded his removability on August 11, 2014, and again on August 10, 2016. He applied for asylum and withholding of removal based on his political opinion—"[o]pposition to the National Party in Honduras and support[] of the LIBRE Party"— and his alleged membership in three social groups: (1) "[f]amily members of LIBRE

[Party] candidates running for office"; (2) "[f]amily members of Suyapa Jacqueline [Trejo Cardon]"—a cousin of Sagastume-Hernandez who successfully ran for mayor as a LIBRE Party candidate; and (3) "family members of that same [cousin] who publicly helped her campaign." AR 99, 118-19. He applied for protection under the Convention Against Torture (CAT) on the same grounds.

In February 2019, an immigration judge (IJ) held a hearing on Sagastume-Hernandez's applications. Sagastume-Hernandez explained that he has supported the LIBRE Party since 2011. When asked why, Sagastume-Hernandez responded that "they had a good proposal for the country to help bring up the economy." AR 124. Sagastume-Hernandez testified that in 2013, his cousin Suyapa Jacqueline Trejo Cardon (Cardon) ran for mayor of the Municipality of Macuelizo, in the Department of Santa Barbara, as the LIBRE Party candidate. She defeated the incumbent mayor, who was a member of the rival National Party. Sagastume-Hernandez told the IJ that he supported Cardon during this campaign by "telling people that she was a good candidate," that "she was going to help people," and that "she was going to open new places for jobs." AR 127.

Sagastume-Hernandez testified that during Cardon's campaign, he was approached by "Elsa," a member of the National Party, who offered him 500 lempiras to vote for the National Party candidate in the presidential race. He declined the offer and told Elsa that he "was not going to betray [his] party." AR 128. According to Sagastume-Hernandez, after Cardon was elected, members of the National Party harassed her, warning her "that if she didn't quit the position she was going to be killed and all her family." AR 127. These threats led Cardon to step down as mayor, after which the former mayor reassumed power.

Sagastume-Hernandez also recounted an incident in March 2014 when he was verbally threatened by a member of the National Party named "Gido."[1] At the time, Sagastume-Hernandez worked at Chumbagua, a sugar company, selling food, water, and sodas. Gido approached him at work and "said that if he would see me again he wouldn't forgive me." AR 130.[2] Sagastume-Hernandez testified that he kept working at the sugar company "because [he] needed to," but was frightened because Gido was a known drug dealer with a reputation as a "dangerous man" who "like[d] to kill people." *Id.* Sagastume-Hernandez reported the incident to police in Santa Barbara, but they informed him "[t]hat they couldn't do anything against [Gido] if they didn't have any evidence." AR 137.

According to Sagastume-Hernandez, he "did not know at the time why [Gido] had threatened [him]." AR 152. But "a couple of months later, [he] found out that [Gido] [was] one of the men who approached [his] cousin [Cardon] and told her that she had to resign from the position [of mayor] or all of her family would be killed." *Id.* Sagastume-Hernandez explained, "When I found out that [Gido] was one of the people who threatened my cousin, . . . I fled immediately because I was afraid that he would kill me since I am [her] cousin." *Id.*

Sagastume-Hernandez testified that he fled Santa Barbara to San Pedro Sula, a city in Honduras roughly two hours away. He stayed there with his sisters for three months and was not

---

[1] The record reflects three spellings for the individual who threatened Sagastume-Hernandez. He is referred to as "Gido" in the immigration hearing transcript, AR 129, "Gaido" in Sagastume-Hernandez's written application, AR 151, and "Gaydo" by a Honduran news source, AR 207. Because Sagastume-Hernandez's brief utilizes the spelling "Gido," we do the same.

[2] Sagastume-Hernandez included the same incident in the addendum to his written application for asylum, explaining that "[i]n March of 2014, about three months before I left Honduras, [Gido] approached me when I was working at Chumbagua and told me that he didn't want to see me there anymore. He told me that if he saw me there again, he would not pardon me." AR 151-52.

verbally or physically threatened. After three months, he passed through Guatemala and Mexico before arriving in the United States.

Regarding his family remaining in Honduras, Sagastume-Hernandez explained that Cardon remained in the Department of Santa Barbara. She ran for mayor as a LIBRE Party candidate again in 2018 and won. His father and sisters also remained in Honduras but relocate occasionally. Sagastume-Hernandez testified that Gido threatened his father and sisters in Honduras in 2014, and again in 2016. However, he conceded that no one has ever physically harmed him or his family members. According to Sagastume-Hernandez, all threats against his family members ceased in 2016. Further, Sagastume-Hernandez testified that Gido was killed in 2018. He suspected that drug traffickers committed the murder to "settle some debt." AR 134.

At the conclusion of the hearing, the IJ denied Sagastume-Hernandez's petition for asylum and withholding of removal. Although the IJ accepted Sagastume-Hernandez's testimony about Gido as truthful, the IJ concluded that Sagastume-Hernandez failed to establish an appropriate nexus between Gido's threat and Sagastume-Hernandez's political opinion or social groups. The IJ was "not satisfied that any threat issued to the respondent was *because of* his political opinion." AR 67 (emphasis added). The IJ further found that Sagastume-Hernandez was never physically harmed in any way, and that his testimony that he was verbally threatened by a drug trafficker on one occasion failed to rise to the level of past persecution.

Additionally, the IJ noted that Sagastume-Hernandez did not demonstrate an objective basis for fear of future persecution, given that (1) the only person who threatened Sagastume-Hernandez—Gido—died in 2018; (2) Cardon was elected mayor under the LIBRE Party platform a second time in 2018 and has continued to serve as mayor without any threats or harm to her person; and (3) Sagastume-Hernandez's father and sisters have remained in Honduras as both

supporters of the LIBRE Party and family members of Cardon without sustaining any physical harm, and were only threatened twice, with the last threat coming from the now-deceased Gido in 2016.

Finally, the IJ found that Sagastume-Hernandez could reasonably relocate within Honduras, since the threat against him came from a now-deceased person in Santa Barbara, and considering that Sagastume-Hernandez moved two hours away to San Pedro Sula where he lived for three months without incident.

The IJ also denied the claim for protection under the CAT because there was "no showing that [Gido] was a governmental actor in any way," nor that the government of Honduras engages in or consents to the torture of its citizens based on political party. AR 70.

Sagastume-Hernandez appealed to the Board of Immigration Appeals (BIA), which affirmed the IJ's order of removal. He then brought this petition for review.

## II.

When the BIA reviews an IJ's decision de novo and issues its own separate opinion, we review the BIA's opinion as the final agency determination. *Guzman-Vazquez v. Barr*, 959 F.3d 253, 259 (6th Cir. 2020). But we review the IJ's decision to the extent the BIA adopts its reasoning. *Id*. We defer to an agency's findings of fact if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (citation and internal quotation marks omitted). Such findings are conclusive unless "any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (quoting *Ben Hamida v. Gonzales*, 478 F.3d 734, 736 (6th Cir. 2007)). We review questions of law de novo. *Id.*

To establish an entitlement to asylum, an applicant must show that he or she is "unable or unwilling" to return to his or her country because of "past persecution or a 'well-founded fear' of

future persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Bonilla-Morales v. Holder*, 607 F.3d 1132, 1136 (6th Cir. 2010) (quoting 8 U.S.C. § 1101(a)(42)); *see also* 8 U.S.C. § 1158(b) (providing that the burden of proof is on the applicant to establish refugee status). The applicant must also establish that the alleged protected ground "was or will be at least one central reason" for the persecution. *Umaña-Ramos v. Holder*, 724 F.3d 667, 671 (6th Cir. 2013) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)).

To succeed on a withholding claim, an applicant must show that there is a "clear probability" that he or she will be persecuted if forced to return to his or her country, and that the persecution would be on account of race, religion, nationality, membership in a particular social group, or political opinion. *Id.* at 674; *see also Guzman-Vazquez*, 959 F.3d at 274 (finding that withholding applicants "must demonstrate that a protected ground was at least one reason for their persecution").

### III.

Sagastume-Hernandez contends that his evidence met these thresholds because he "successfully demonstrated past persecution and a well-founded fear of future persecution on account of his political opinion and membership in a particular social group." Petitioner Brief 3.

#### A. Past Persecution

Sagastume-Hernandez argues that he established proof of threats from members of the National Party, and that those threats were due to his allegiance to the LIBRE Party and his familial ties to a LIBRE Party candidate. However, in both his application and at his hearing, Sagastume-Hernandez only identified one incident with specificity: Gido's verbal threat made at the Chumbagua sugar company in March of 2014.

The record does not conclusively connect this event to Sagastume-Hernandez's political opinion or his relationship with Cardon. Sagastume-Hernandez's written application stated: "[Gido] approached me when I was working at Chumbagua and told me that he didn't want to see me there anymore. He told me that if he saw me there again, he would not pardon me." AR 151-52. Sagastume-Hernandez testified to similar effect at his hearing. When asked exactly what Gido told him, Sagastume-Hernandez answered: "That if he ever saw me again he wouldn't forgive me." AR 123. None of the statements attributable to Gido mention, or even indirectly reference, Sagastume-Hernandez's politics or family. When asked how Gido would even know of his political affiliations, Sagastume-Hernandez answered, "I don't know how he knew." AR 138. Further, in his application, Sagastume-Hernandez wrote that "[he] did not know at the time why [Gido] had threatened [him]." AR 152. Such confusion indicates that Gido did not mention the LIBRE Party, National Party, Cardon, or anything related to politics at the time of the confrontation.

Sagastume-Hernandez speculates that since Gido was one of the men who threatened his cousin and intimidated her into stepping down as mayor, he must have also targeted Sagastume-Hernandez over politics. But Sagastume-Hernandez also explained that Gido was the leader of a group of drug traffickers, and a violent man with a dangerous reputation who "like[d] to kill people" and "beat his workers." AR 129-30, 151. This suggests that Gido may have had a different motivation to threaten Sagastume-Hernandez, separate and apart from his politics. "Asylum is not available to victims of indiscriminate violence, unless they are singled out on account of a protected ground." *Bonilla-Morales*, 607 F.3d at 1138 (quoting *Delgado-Ortiz v. Holder*, 600 F.3d 1148, 1151 (9th Cir. 2010)). Here, the evidence does not compel the conclusion that Gido's threat was based on Sagastume-Hernandez's political opinion or family, as opposed to Gido's general

-7-

penchant for violence or his role as a drug trafficker. *See Myftari v. Mukasey*, 302 F. App'x 401, 408–09 (6th Cir. 2008) (finding that a petitioner failed to establish a nexus between her past persecution and her political opinion, in part because her assailants did not mention politics, nor give her any reason to believe they were kidnapping her because of her political associations, and because there was an alternative explanation for their conduct). We therefore must affirm the BIA's decision that Sagastume-Hernandez failed to establish the requisite nexus between a statutorily protected ground and any past persecution.

Nor do we find persuasive Sagastume-Hernandez's argument that the "relationship between the economic and social agendas of the National Party" necessitates a mixed-motive analysis, and therefore the BIA erred by failing to consider "the relationship between the political agenda of the National Party and their ulterior motive of seeking revenge against [Sagastume-Hernandez]." Petitioner Brief 12-13. A mixed-motive analysis still requires the petitioner to demonstrate that a protected ground motivated the persecution in part. *Guzman-Vazquez*, 959 F.3d at 270, 274 (explaining that with respect to asylum claims, "the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant," and that applicants for withholding of removal must demonstrate that "a protected ground was at least one reason for their persecution"). Here, the BIA concluded that Sagastume-Hernandez failed to establish any nexus between a statutorily protected ground and past persecution, and that there was insufficient evidence to prove Gido's one-time threat had "any connection to [Sagastume-Hernandez's] political opinion or his relationship to his cousin." AR 4. The evidence adequately supports this conclusion. As discussed, Sagastume-Hernandez was unable to explain how Gido knew of his political affiliations or family relationship to Cardon. His own declaration implies that Gido did not refer to either politics or

family in his threat. And none of the affidavits proffered by Sagastume-Hernandez's family members shed light on the motivation behind Gido's attack; they merely reiterate, in vague terms, that Sagastume-Hernandez left Honduras because he feared for his life.

Such evidence does not compel the conclusion that Sagastume-Hernandez's political beliefs or family ties had a role in motivating Gido's attack, even under a mixed-motive analysis. Absent evidence establishing that Gido's March 2014 threat was motivated, at least in part, by Sagastume-Hernandez's politics, the BIA did not err in denying his petition due to lack of nexus.

Further, even assuming that Sagastume-Hernandez established a nexus between Gido's 2014 threat and a protected ground, the BIA's conclusion that "the vague threat directed toward [Sagastume-Hernandez] on a single occasion at work does not establish harm amounting to past persecution" was not erroneous. AR 4. Persecution within the meaning of 8 U.S.C. § 1101(a)(42)(A) entails "more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998). Sagastume-Hernandez does not explain how his single encounter with Gido, which never escalated beyond a vague verbal threat, was severe enough to constitute persecution. *See Japarkulova v. Holder*, 615 F.3d 696, 701 (6th Cir. 2010) ("In the vast majority of cases, . . . mere threats will not, in and of themselves, compel a finding of past persecution." (quoting *Boykov v. INS*, 109 F.3d 413, 416 (7th Cir. 1997))).

Because the evidence does not conclusively establish past persecution on account of Sagastume-Hernandez's political opinion or particular social group, the BIA did not err in denying this petition on those grounds.

B. **Future Persecution**

Nor has Sagastume-Hernandez established a well-founded fear of future persecution because of his political opinion or membership in a particular social group. Because Sagastume-Hernandez did not establish past persecution, he must "independently establish a well-founded fear of future persecution." *Kukalo v. Holder*, 744 F.3d 395, 401 (6th Cir. 2011). This can "be based on either a likelihood of harm specifically targeted at the applicant or a 'pattern or practice' of persecuting others similarly situated." *Yu Yun Zhang v. Holder*, 702 F.3d 878, 880 (6th Cir. 2012) (quoting 8 C.F.R. § 1208.3(b)(2)(iii)).

Sagastume-Hernandez provides country condition reports and news articles that he claims "establish[] a pattern or practice in Honduras of members and supporters of minority political parties being threatened and harassed by members of the National Party." Petitioner Brief 15. He also points out that members of the National Party threatened other members of his family to the point that they frightened his cousin into renouncing her position as mayor.

We agree with the BIA that this fails to satisfy Sagastume-Hernandez's burden. The only person to ever threaten him personally—Gido—died in 2018. Sagastume-Hernandez offers no evidence that anyone else in Honduras intends to do him harm. Further, Sagastume-Hernandez testified that his father and two sisters, all LIBRE Party supporters, have remained in Honduras without suffering any threats or harm. By his own admission, all threats against these family members ceased in 2016. Cardon even ran for mayor as a LIBRE Party candidate in 2018 and won. She, like Sagastume-Hernandez's father and sisters, has not been threatened, verbally or physically, since 2016. That Sagastume-Hernandez's alleged persecutor is deceased and his remaining family has not suffered a threat in several years indicates that Sagastume-Hernandez's fear of future harm is not objectively reasonable. *See Bonilla-Morales*, 607 F.3d at 1138 (finding

that an applicant failed to establish a well-founded fear of future persecution, in part because her family remained in the country and suffered no mistreatment).

And, as the BIA points out, Sagastume-Hernandez lived for three months without incident in San Pedro Sula. This suggests safe relocation is possible within his home country. When asked if there was any place within Honduras that he could safely live, Sagastume-Hernandez replied: "No, there's also a lot of crime." AR 131. But fear of widespread crime does not establish persecution, and Sagastume-Hernandez did not establish why he would be singled out for mistreatment among the general population. A petitioner "cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but instead must offer reasonably specific information showing a real threat of individual persecution." *Mapouya v. Gonzales*, 487 F.3d 396, 412 (6th Cir. 2007) (citation omitted). Sagastume-Hernandez has not shown that he faces an individualized threat beyond the general threat to the population from "crime." *Cf. Kamara v. Holder*, 362 F. App'x 466, 470–71 (6th Cir. 2010) (rejecting a claim of well-founded fear of future persecution where the petitioner could not establish why the "bad people" running his country would single him out for harm); *Lumaj v. Gonzales*, 462 F.3d 574, 578 (6th Cir. 2006) (rejecting a claim of well-founded fear of future persecution because although a widespread threat of violence existed in Albania, there was no evidence that individuals were targeted on political grounds).

Accordingly, the record does not compel the conclusion that Sagastume-Hernandez has an objectively reasonable fear of future persecution on account of his political opinion or membership in a particular social group. Sagastume-Hernandez's asylum claim fails.

### C. Withholding of Removal and CAT Claims

Because Sagastume-Hernandez's asylum claim fails on the grounds that he did not establish past or future persecution, and his withholding of removal and CAT claims are based on

the same evidence, these claims necessarily fail as well. *See Sarr v. Gonzales*, 485 F.3d 354, 361-62 (6th Cir. 2007) (rejecting a claim for the withholding of removal because the applicant did not meet the more lenient standard for asylum); *see also Guzman-Vazquez*, 959 F.3d at 273–74 (discussing why "an alien must meet a higher burden in establishing a right to withholding of removal than in demonstrating asylum eligibility" (quoting *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005))). "An applicant seeking relief under the Convention Against Torture has the burden of proving that it is more likely than not that he will be tortured if removed to the proposed country." *Berri v. Gonzales*, 468 F.3d 390, 397 (6th Cir. 2006) (citing 8 C.F.R. § 208.16(c)(2)). For the same reasons Sagastume-Hernandez failed to demonstrate that persecution on these grounds was more likely than not, he also fails to demonstrate that torture on these grounds is more likely than not. *See id.* at 397-98 (denying relief under the CAT where petitioners based their CAT claims on the same grounds as their unsuccessful requests for asylum and withholding).

## IV.

For the reasons set out above, we deny Sagastume-Hernandez's petition for review of his claims for asylum, withholding of removal, and relief under the Convention Against Torture.